**In re Donald R. CRUICKSHANK, Debtor.**

**Dorothy J. WOODAMS, Plaintiff,**

v.

**Donald R. CRUICKSHANK, Defendant.**

**Bankruptcy Nos. 85–20759, 85–2098A.**

United States Bankruptcy Court, W.D. New York.

Aug. 19, 1986.

728

Buyck, Springer, Fitzsimmons, Fitzpatrick, Desmarteau & Stander by Louise Rossi Beale, Rochester, N.Y., for plaintiff.

LaLoggia & Gorankoff by Lisa Morris, Rochester, N.Y., for defendant.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

An adversary proceeding was filed by the plaintiff, Dorothy J. Woodams, on October 3, 1985 seeking the denial of a discharge of a debt owed to her by the debtor, Donald R. Cruickshank. The basis of the plaintiff's original complaint lies within 11 U.S.C. § 523. The complaint also generally seeks the denial of discharge of the debtor presumably under 11 U.S.C. § 727. At the time of the trial, a motion was heard to amend the complaint to specifically allege that the debtor should be denied a discharge under 11 U.S.C. § 727. The motion was granted with the consent of opposing counsel and pursuant to Bankruptcy Rule 7015 and the authority vested in this Court as enunciated in *In re Dunn*, 49 B.R. 547 (Bankr.W.D.N.Y.1985).

While many of the detailed facts leading up to the trial are in dispute, the overall tenor of this case is quite clear. Ms. Woodams loaned Mr. Cruickshank a total of $7,673.40 between November 12, 1982 and November 27, 1982. The money was disbursed to Mr. Cruickshank in three separate amounts, all for the purpose of opening a roller skating business known as Let The Good Times Roll. Mr. Cruickshank was the owner/operator of the unincorporated business with Ms. Woodams as a lender to the business. Ms. Woodams also volunteered her services in the operation of the business whenever she could but was never considered a partner of the business by either party.

The business was in operation from approximately November, 1982 until April, 1985. While the business was in operation, it usually ran near a break even level with perhaps a slight profit in one year. The relatively poor financial showing of the business could possibly be attributed to the apparent irregular hours in which the store was open.

The store was officially closed on June 12, 1985 when all of the inventory and furnishings were moved to Mr. Cruickshank's residence. The closing occurred after several attempts to sell the business failed including the listing of it with a realtor.

A valuation of the inventory and furnishings as of May 31, 1985, which was not contested by Mr. Cruickshank, indicates the inventory on hand at that time cost $3,991.63 and had a retail value of $7,660.02. The store furnishings were listed at their cost of $694.00.

It appears that a week or two before Mr. Cruickshank filed his petition in bankruptcy, he consulted an attorney of the office of LaLoggia & Gorankoff. The attorney advised Mr. Cruickshank to convert the inventory and furnishings into cash because a certain amount of cash would be exempt when a bankruptcy petition is filed. Mr. Cruickshank sold the inventory and furnishings to a Mr. Watson for $600.00 on

June 24, 1985. From June 25th through June 27th, Mr. Cruickshank participated in a garage sale at his residence in which the business assets were resold with the proceeds allegedly going to Mr. Watson who was conducting the sale.

Mr. Watson did not appear at the trial to verify the aforementioned transactions because his whereabouts were unknown. In fact, Mr. Cruickshank testified that he knew Mr. Watson for nine years and never knew where he lived nor where he worked.

The deal struck between Mr. Cruickshank and Mr. Watson occurred in a bar on the day previously mentioned. Mr. Watson had no experience in a roller skating related business, he allegedly only desired to take advantage of the good deal Mr. Cruickshank offered him. Mr. Cruickshank's proof of the consummation of the deal is a receipt for the sale of goods for $600.00.

Mr. Cruickshank testified that the $600.00 he allegedly received from Mr. Watson was spent on his wife, accessories for the house, food, and other items prior to the date of the petition filing. The petition was actually filed on June 28, 1985 even though the date next to the signature on the petition reads June 25, 1985. The petition lists $625.00 as exempt cash.

The two issues presented are whether the debt owed to Ms. Woodams by the debtor should be excepted from a discharge under § 523(a)(2)(A) and also whether a discharge should be totally denied to the debtor under § 727(a)(2)(A).

The issue of whether to except Ms. Woodams debt from any discharge of the debtor must be decided against the plaintiff. Section 523(a)(2)(A) reads as follows:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The proof submitted at the trial did not indicate that the debtor used false pretenses, false representations, or actual fraud in obtaining the loans from Ms. Woodams. The purpose of the loans was for the opening of a roller skating related business. That opening actually took place. The fact that the business was unsuccessful after two and one-half years of operation and the fact that perhaps the business was not run in the most professional manner does not imply any falsity or fraud in the initial obtaining of the funds in question.

The second issue requires a more detailed inquiry. Section 727(a)(2)(A) states the following:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition.

There is no question that property of the debtor was transferred within one year before the date of the filing of the petition and the transfer was made to the detriment of creditors. The debtor readily admits that he sold the business assets to Mr. Watson less than one week before his bankruptcy petition was filed with this Court and his purpose was to convert nonexempt property into exempt property, thus, putting it out of the reach of his creditors. The key to deciding this issue is whether the debtor at the time of the transfer, had the requisite intent to hinder, delay, or defraud a creditor.

Mere conversion of property from nonexempt to exempt on the eve of bankruptcy—even though the purpose is to shield the asset from creditors—is not

enough to show fraud. *First Texas Savings Association v. Reed*, 700 F.2d 986, 991 (5th Cir.1983). In fact, it is clear from the legislative history of The 1978 Act that the debtor is to be allowed to make full use of his exemptions. The House and Senate Reports stated the following:

"As under current law, the debtor will be permitted to convert non-exempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6317; S.Rep. No. 989, 95th Cong., 2d Session 76, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5862 (emphasis added).

Significantly, however, both the House and Senate Reports used the phrase "[a]s under current law." Under existing law prior to passage of the 1978 Act, courts qualified this apparent blanket approval of conversion by denying the discharge if there was extrinsic evidence of actual intent to defraud creditors. *First Texas Savings Association v. Reed*, 700 F.2d 986, 990 (5th Cir.1983). This qualification applies as well in cases arising under the 1978 Act. *Id.; Schmidt v. White (In re White)*, 28 B.R. 240 (Bankr.E.D.Va. 1983). Thus, if the transfer of property occurs within one year of the bankruptcy filing and there is evidence to indicate a fraudulent purpose aside from the mere conversion of non-exempt property, the claimed exemption is subject to the fraudulent transfer provision of Section 727.

*In re Ford*, 773 F.2d 52, 54–55 (4th Cir. 1985).

Because fraudulent intent is rarely susceptible to direct proof, *In re Saphire*, 139 F.2d 34, 35 (2nd Cir.1943), badges of fraud have been developed to establish the requisite actual intent of fraud. The Second Circuit in *In re Kaiser*, 722 F.2d 1574, 1582–83 (2nd Cir.1983), *citing, In re May*, 12 B.R. 618, 627 (Bankr.N.D.Fla.1980), characterizes the badges of fraud as follows:

"(1) the lack or inadequacy of consideration;

"(2) the family, friendship or close associate relationship between the parties;

"(3) the retention of possession, benefit or use of the property in question;

"(4) the financial condition of the party sought to be charged both before and after the transaction in question;

"(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

"(6) the general chronology of the events and transactions under inquiry."

The fact pattern of this case falls within several of the aforementioned badges of fraud. The consideration paid by Mr. Watson to the debtor was totally inadequate. Mr. Watson paid $600.00 for goods costing $4,685.63 and which would sell at retail for $8,354.02. What makes the transfer price even more economically absurd is that on the days immediately following the transfer, Mr. Watson resold the goods at a garage sale initiated by, partially conducted by, and held at the residence of the debtor. The receipts received by this sale were not divulged at the trial, but it was put into evidence that on only two sales Mr. Watson received at least $350.00. These facts when taken in toto establish the badge of fraud of the inadequacy of consideration.

The facts also lean toward the showing of a close associate relationship between Mr. Watson and the debtor. While the debtor did testify that he did not know Mr. Watson's residence or line of work, he did state that he had known Mr. Watson for about nine years. The convenient inability to produce Mr. Watson during the trial, while not negating the debtor's testimony concerning what actually transpired, does

not add to the credibility and veracity of Mr. Cruickshank's version of the facts.

The general financial condition of the debtor also falls into one of the badges of fraud. The debtor admits he was in financial difficulties prior to the transfer. He also admits that the transfer was made solely to convert non-exempt assets into exempt assets. Because his reasoning for the transfer was strictly to convert the assets to exempt assets and not a motive which could be defended so as to not harm creditors, another badge of fraud test has been met.

And finally, the general chronology of events must be considered a badge of fraud in this case. Without rehashing the entire scenario leading up to the transfer and the filing of the petition, it is sufficient to point out that the debtor went to his attorney about two weeks prior to the transfer, the transfer took place on June 24th, the petition was signed on June 25th, a garage sale took place from June 25th through June 27th, and the petition was actually filed on June 28th. A more clear general chronology of events indicating a badge of fraud could not be conceived of.

A defense which the debtor did not raise but which the Court feels compelled to comment upon, is the issue of relying upon his attorney's advice.

> Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts. *See, e.g., Hultman v. Tevis,* 82 F.2d 940, 941 (9th Cir.1936); *In re Nerone,* 1 B.R. 658, 660 (Bankr.S.D.N.Y. 1979). However, the debtor's reliance must be in good faith. *See Hultman,* 82 F.2d at 941; *Nerone,* 1 B.R. at 660.

*In re Adeeb,* 787 F.2d 1339, 1343 (9th Cir. 1986). Good faith reliance would require that the purpose of the transfer be something other than for the purpose of hindering, delaying, or defrauding a creditor. It is quite apparent from the testimony that the purpose of the transfer was to convert non-exempt assets into exempt assets which would defraud the creditors. This defrauding of the creditors was not only

committed by the actual transfer by the debtor, but may have been aided by the attorney in giving that type of advice.

> Such a finding precludes the defense of good faith reliance on the advice of an attorney even if the client is otherwise innocent of any improper purpose. A debtor who knowingly acts to hinder or delay his creditors acts with the very intent penalized by section 727(a)(2)(A).

*In re Adeeb,* 787 F.2d 1339, 1343 (9th Cir. 1986).

In conclusion, it is therefore ordered that the action to deny the discharge of the debt owed by the debtor to Ms. Woodams under 11 U.S.C. § 523 is denied, but, the amended action to totally deny the discharge of the debtor under 11 U.S.C. § 727 is granted.