In re Robert James JOHNSON, Debtor.

Harold J. PANUSKA, as Trustee for the Harold J. Panuska Profit Sharing Trust and the Harold J. Panuska Employee Trust Fund, Plaintiff,

v.

Robert James JOHNSON, Defendant.

Bankruptcy No. 3–86–207.
Adv. No. 3–86–107.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Dec. 18, 1987.

Cass Weil, St. Paul, Minn., for defendant.

Gordon B. Conn, Jr., Minneapolis, Minn., for plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the undersigned United States Bankruptcy Judge for trial on September 16, 1987. Plaintiff appeared by his attorney, Gordon B. Conn, Jr. Defendant (hereinafter "Debtor") appeared by his attorney, Cass S. Weil. Upon the evidence adduced at trial, briefs and argument of counsel, and all of the other files and records in this adversary proceeding and in Debtor's bankruptcy case, the Court concludes that judgment must be granted in favor of Debtor.

### FINDINGS OF FACT

Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code in this Court on January 24, 1986. Debtor is a St. Paul, Minnesota physician, currently age 43. Until December, 1985, he was a partner in Rice Street Clinic, P.A., a St. Paul family medical practice. His annual income for the years 1983 through 1985 ranged from $192,000.00 up to $300,000.00. Since December, 1985, Debtor has been a salaried employee of the Rice Street Clinic, receiving an income of approximately $99,-000.00 per year from his Clinic salary and compensation from other part-time administrative and medical-faculty positions which he holds.

In 1983, Debtor became an investor-principal in Growth Ventures Inc. (hereinafter "GVI"), a St. Paul-based entity which engaged in the purchase and sale of commercial real estate and other business and commercial investment activity, by acquiring 2 percent of its outstanding shares. GVI's various "hard" investments were heavily leveraged. Debtor subsequently personally guaranteed most of GVI's major indebtedness, resulting in actual or potential personal liability to him (as noted on his bankruptcy schedules) of over $19,000,000.00. Due to the abatement of inflation in the early 1980's, changes in the economy, and the poor performance of many of GVI's investments, GVI was unable to meet its debt service requirements in 1984–5. As a result, numerous major creditors of GVI sued Debtor and GVI's other guaranteeing investor-participants starting in mid–1985. Many of the prayers for relief in these lawsuits were for damage awards in the hundreds of thousands of dollars. Several of the plaintiff-creditors docketed major judgments against Debtor in Minnesota State District Court in the fall of 1985. The plaintiff's counsel in at least two of these actions then conducted proceedings supplementary, examining Debtor in discovery preliminary to judgment collection. Several judgment creditors used collection process to garnish several of Debtor's bank accounts in the fall and early winter of 1985. As a result of the onslaught of collection activity by GVI's creditors, Debtor first considered bankruptcy as a remedy in the late spring or early summer of 1985. He first consulted with a prominent Minneapolis bankruptcy lawyer in June, 1985. On several occasions between June and November, 1985, they discussed GVI's worsening financial condition, bankruptcy and non-bankruptcy alternatives for the corporation, Debtor's personal liability on the various corporate obligations, and protections from the claims of GVI's creditors that were available to Debtor individually. During these consultations Debtor gained a thorough knowledge of the concept of exempt property in the law of debtor-creditor relations, and a general understanding of the types of property which were made

exempt from claims of general creditors under Minnesota statute. Specifically, Debtor was advised that it was "not fraudulent on [his] creditors to transfer non-exempt assets into exempt assets," via the sale of investments and other liquid assets and use of the proceeds to reduce the mortgage on his homestead or to purchase cash value life insurance.[1] In addition, Debtor was advised that, "to the extent that [he] held a certificate issued by [a fraternal benefit] association authorized to do business under [MINN.STAT. c. 64A], the funds represented thereby could not be taken by any of [his] creditors," and that an annuity or other fund represented by such a certificate "is a shelter against creditors."[2]

During 1985, Debtor also consulted with two other attorneys who had been his counsel on other personal and business matters, as well as his present bankruptcy counsel. All of them advised him, with varying degrees of specificity, that the practice of converting non-exempt assets to exempt assets was not prohibited by the law *per se*. As early as the early summer of 1985, Debtor thus believed that he could pay off all existing liens and encumbrances against his homestead and then continue to hold it free of the claims of his creditors.

Acting solely upon the advice of his various attorneys, and their assessment and advice as to the relative risks to resultant claims of exemption associated with such conversions to various classes of exempt property, Debtor undertook the following actions between early June, 1985, and January 8, 1986:

1. Using current income from professional and director fees and the collection of accounts receivable, the proceeds of sale of stock investments which he made in 1984 (including stock gains of approximately $69,000.00), and cash and bank accounts, Debtor made several large lump-sum payments totalling approximately $100,-000.00 to Twin City Federal Savings and Loan Association between June 14 and August 30, 1985, to pay off in full a loan secured by that creditor's first mortgage against his Crocus Hill homestead.[3]

2. Using the proceeds totalling $54,-511.32 from his sale back to Rice Street Clinic, P.A., and 1006 Rice Street Company of his one-eighth interest in those entities, and other liquid assets, he paid off in full a prior loan from First Bank Grand secured by that creditor's second mortgage against his homestead, on December 20, 1985, and a marriage dissolution lien against his homestead in favor of Ellen O. Connelly, his ex-wife, on December 21, 1985. These payments totalled approximately $75,000.00.

3. Using the proceeds of his December 31, 1985 sale of his share in Ramie Estates Limited Partnership ($8,000.00), his January 2, 1986 sale of his one-quarter interest in Bethel Marine, Inc. and Reanjoza Partnership ($5,000.00), his December 25, 1985 sale of his share in Labor Retreat Limited Partnership ($31,000.00), and value derived from his accounts in the pension and profit-sharing plans of Rice Street Clinic, P.A., and his own personal business corporation, Debtor purchased, individually or through the pension and profit-sharing plans, annuities from Modern Woodmen of America of a total outstanding face value of $231,-905.32 as of the commencement of his bankruptcy case, a whole life insurance policy from National Life of Vermont in a value of $4,000.00 as of the commencement of the case, and an Individual Retirement Account from

---

1. See Defendant's Exhibit 1 (letter of James H. Levy, Esq., to Debtor, dated July 8, 1985).

2. See Defendant's Exhibit 1 (letter of James H. Levy, Esq., to Debtor, dated November 21, 1985).

3. Debtor schedules the value of his homestead at $285,000.00. Apparently he is the sole record holder of title. The only remaining encumbrance against it is one in favor of First Security State Bank of St. Paul, given to secure his personal guarantee of a loan made to Bethel Marine, Inc. Debtor characterizes his liability on this debt as "contingent."

Modern Woodmen of America, in a value of $3,978.90 as of the commencement of the case.

4. On December 1, 1985, Debtor traded miscellaneous antique furniture, clocks, pictures, cameras, and equipment to Jabar, Inc. for one baby grand piano.

5. On December 18, 1985, Debtor traded his collection of six wooden boats varying from 28 to 45 years of age, of an approximate value of $8,000.00, for a harpsichord of European manufacture.

6. On January 4, 1986, Debtor sold various household decorations, furnishings, clocks, tools, books, and a 1973 Pontiac automobile to Beth Kessler, his live-in girlfriend, for the sum of $6,900.00, and a 1929–vintage wooden boat for the sum of $2,000.00, and deposited the proceeds of these sales into his Modern Woodmen of America annuity accounts and/or IRA.

7. On January 8, 1986, Debtor sold his boat slip at St. Croix Valley Marina to Kessler for a cash payment of $3,000.00 and her assumption of the $8,000.00 debt outstanding against it, and deposited the proceeds of this sale into his Modern Woodmen of America annuity accounts and/or IRA.

Debtor revealed all of these transfers in item 12.b. of the Statement of Financial Affairs in his Chapter 7 case, and has testified candidly about all of them. Plaintiff has acknowledged through counsel that none of these transfers is voidable for want of consideration as a fraudulent conveyance.

In liquidating various assets which he knew to be non-exempt, and in using the proceeds to satisfy all of his homestead encumbrances and to purchase the Modern Woodmen of America annuities and life insurance policy, Debtor acted with the "hope and intent" that these assets in their final forms would be "beyond the reach of [his] creditors," and that they would be exempt in bankruptcy. As late as mid-December, 1985, Debtor had not made a final decision to file for bankruptcy, though by the end of that month it was clear from his

actions that he had concluded that this was his only realistic alternative for debt relief. Though throughout this time Debtor never actively volunteered to any creditor what he was doing with his estate, there is no evidence that he ever fraudulently misrepresented his actions, his then-current intentions toward satisfaction of his liabilities, or the current or changing composition of his personal wealth. Debtor was examined in proceedings supplementary to execution in at least two of the state court actions during or after November, 1985. Plaintiff did not offer transcripts of these examinations into evidence, so it is unknown whether any of Debtor's creditors or their counsel ever inquired of him as to these activities. It is clear, however, that all of Debtor's judgment creditors had full opportunity to do so, and to attempt to halt the process, by resort to attachment, sequestration, or other collection remedies under Minnesota statute. There simply is no evidence that, during the latter half of 1985 and early 1986, Debtor ever concealed his ownership of non-exempt assets, or concealed or misrepresented the fact that he was then engaged in a conversion *en masse* of non-exempt assets into exempt assets.

In his Schedule B–4, Debtor claimed his full equity interest in his homestead, the Modern Woodmen accounts and annuities, the pension and profit-sharing plans, and the musical instruments under MINN. STAT. § 510.01 *et seq.* and various subdivisions of MINN.STAT. § 550.37. The Chapter 7 Trustee, Plaintiff, and Bremer Tower (another creditor) all timely filed various objections to Debtor's claims of exemption in these and various other assets. By agreement of the parties these objections were continued generally pending the Bankruptcy Court's certification to the Minnesota Supreme Court of the issues ultimately decided in *In re Tveten*, 402 N.W.2d 551 (Minn.1987). They have not been placed back onto the Court's calendar as yet.

## CONCLUSIONS OF LAW

Plaintiff seeks to have Debtor denied his discharge in bankruptcy under the following provision of 11 U.S.C. § 727(a):

(a) The court shall grant the debtor a discharge, unless—

.    .    .    .    .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

> (A) property of the debtor, within one year before the date of the filing of the petition ...

With his prayer for relief framed as such,[4] Plaintiff seeks to have Debtor barred from discharging any and all of his pre-petition liabilities. The discharge in bankruptcy is the foremost remedy to effectuate the "fresh start" which is the goal of bankruptcy relief to the debtor. H.R.REP. No. 595, 95th Cong., 1st Sess. 384 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Consequently, the provisions for objection to discharge under 11 U.S.C. § 727 must be construed strictly in favor of the debtor, and strictly against the objecting creditor. *See, e.g., In re Schmit,* 71 B.R. 587, 589–90 (Bankr.D.Minn.1987); *In re Drenckhahn,* 77 B.R. 697, 701 (Bankr.D.Minn.1987).

This adversary proceeding involves a classic example of what has been popularly called "bankruptcy estate planning"—that is, the conscious, directed effort on the part of a financially-besieged debtor to liquidate personal assets which are not exempt from claims of general creditors under state debtor-creditor law, and to use the proceeds of that liquidation to purchase, or to pay down existing encumbrances on, assets which are exempt under state law, as a preliminary to the debtor's claim of exemptions in those assets in the subsequent bankruptcy case. Given the value of the assets which Debtor subjected to this process, it is not unfair to describe the events

here as "bankruptcy estate planning with a vengeance." The extent to which the provisions of 11 U.S.C. § 727(a)(2)(A) may bar discharge of a debtor in bankruptcy who engaged in "bankruptcy estate planning" has lately received much judicial attention in this Circuit and District. *See McCormick v. Security State Bank,* 822 F.2d 806 (8th Cir.1987); *In re Tveten,* 70 B.R. 529 (Bankr.D.Minn.1987), *aff'd,* 82 B.R. 95 (D.Minn.1987); *In re Schmit, supra.*

All of these decisions share certain basic factual aspects with the case at bar. In all of them, a financially-distressed debtor, with actual or apparent understanding[5] of the nature, effect, and operation of state exemption law, sold or otherwise liquidated non-exempt investments and/or non-essential personal property of substantial value and then used the proceeds to purchase or enhance equity in exempt property. Therefore, these decisions must be considered in the case at bar.

In considering any objection to discharge under 11 U.S.C. § 727(a), the Court must analyze the proceeding by determining whether the plaintiff has proven up all of the statutory elements. Those elements are:

1. A transfer of property has occurred, made by the debtor or made at his direction.
2. The transfer involved property of the debtor;
3. The transfer was made within one year of the commencement of the bankruptcy case;
4. The debtor had, contemporaneously with the transfer, intent to hinder, delay, or defraud a creditor.

*In re Drenckhahn,* 77 B.R. at 704; *In re Clausen,* 44 B.R. 41, 43 (Bankr.D.Minn. 1984). The burden is on the petitioning creditor to prove up all of the elements.

---

**4.** Plaintiff also prayed for a determination of dischargeability of Debtor's debt to him under various provisions of 11 U.S.C. § 523(a). By consent of the parties, the objection to discharge was tried first and is the only cause of action presently before the Court.

**5.** The opinions in all of these cases but *Schmit* note that the debtors went through this process after consulting with an attorney. Given the precision and directed nature of Schmit's actions, it is likely that he did the same.

BANKR.R. 4005; *In re Drenckhahn*, 77 B.R. at 704.

In the case at bar, Debtor acknowledges that the process of liquidation-and-acquisition which he applied to his non-exempt assets did constitute a transfer of his property within one year prior to his bankruptcy filing, thereby satisfying the first three elements.[6] The only remaining issue, then, is whether Debtor made these "transfers" with an "intent to hinder, delay, or defraud a creditor" within the meaning of the statute. This is a two-step inquiry. First, Debtor's actual intent must be found as a matter of fact from the evidence presented, recognizing the inherent and substantial difficulty in doing so.[7] Second, it must then be determined as a matter of law whether Debtor's demonstrated intent constitutes the intent proscribed by the statute.

It is undisputed as a matter of fact that Debtor harbored the specific intent to put all of his rather substantial personal wealth beyond the reach of his business creditors. He has admitted as such. He formed this intent with the prior knowledge that he could lose much of his personal property and investments through judgment collection or through liquidation in bankruptcy. Counsel had advised him that there was at least a chance that he could preserve all of

his wealth for himself by changing the form in which he held it. He was aware from this advice that state law made assets of a particular nature and character exempt from claims of creditors in or outside of bankruptcy, that the law recognized that he could protect his wealth by putting it into forms that were exempt, and that such a conversion of form was not illegal *per se*. Debtor never misrepresented or actively concealed the nature of what he was doing to or from anyone; nor did he otherwise evidence an intent to deceive or mislead his creditors. The only finding supported by the evidence is that Debtor intended to prevent his creditors and/or his trustee in bankruptcy from depriving him of his wealth, and that he intended and did take all of the steps to prevent that deprivation which counsel had advised him were available to him under law.

The real question, then, is legal: Does such an intent constitute the intent which Congress considered so abusive as to merit denial of discharge under 11 U.S.C. § 727(a)(2)(A)? The inquiry begins with the recognition that a petitioning creditor must prove actual intent to hinder, delay, or defraud creditors under § 727(a)(2); a showing of constructive intent is not sufficient. *Lovell v. Mixon*, 719 F.2d 1373,

---

**6.** At least until *McCormick*, Debtor could have made a colorable argument that a "transfer" of his property within the meaning of 11 U.S.C. § 727(a)(2) had not occurred, in that he had retained the full monetary value of his prepetition non-exempt property and had only transmuted the form in which he held it, and that application of § 727(a)(2) should be limited to transfers of property *made to third parties* as part of an effort to secrete assets from creditors. There is some support for this conclusion in the caselaw; it has been noted that the language of § 727(a)(2)(A) "demonstrates that Congress intended to deny discharge to debtors who take actions designed to keep their assets from their creditors *either by hiding the assets until after they obtain their discharge in bankruptcy or by destroying them*." *In re Adeeb*, 787 F.2d 1339, 1344–5 (9th Cir.1986) (emphasis added). The Eighth Circuit has ruled, however, that a "transfer" of non-exempt property between various situses of deposit or investment, with an intervening "transformation" into an exempt form, is sufficient to constitute a "transfer" within the meaning of § 727(a)(2), even though the full legal interest in the property's value continues

with the debtor throughout. *McCormick*, 822 F.2d at 808.

**7.** The courts have recognized that only on the rare occasion can a creditor produce direct proof of a debtor's intent to hinder, delay, or defraud creditors within the meaning of § 727(a)(2). *In re Tveten*, 70 B.R. at 532, and cases cited therein. Thus, the creditor must usually rely on a combination of circumstances which may suggest in their entirety that the debtor harbored the proscribed intent. The court may then make an inference from this evidence. *Id. See also In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987); *In re Eberle*, 61 B.R. 638, 646 (Bankr.D.Minn.1985); *In re Harms*, 53 B.R. 134, 141 (Bankr.D.Minn.1985); *In re Barnacle*, 44 B.R. 50, 55 (Bankr.D.Minn. 1984); and *In re Pommerer*, 10 B.R. 935, 940 (Bankr.D.Minn.1981) (all recognizing that a debtor's fraudulent intent for the purposes of an exception to discharge under 11 U.S.C. § 523(a)(2) is rarely proven by direct evidence, and generally must be inferred from a pattern of facts and circumstances, if found at all).

1376–7 (8th Cir.1983); *In re Bateman,* 646 F.2d 1220, 1222 (8th Cir.1981) (Act case). The statute phrases the operative terms "to hinder, delay, or defraud" in the disjunctive. A creditor need only show that the debtor acted with one of the three states of mind; a showing of intent to defraud is not necessary, and a showing only of intent to hinder or delay creditors is sufficient. *In re Bateman,* 646 F.2d at 1225 n. 5.

The facts cannot support a conclusion that Debtor acted with an intent to defraud his creditors. "Actual fraud involves moral turpitude ... it connotes deceit, artifice, or trick which involves a direct and active operation of intellect which is designed to mislead." *In re Pommerer,* 10 B.R. at 939 (citations omitted). Debtor's actual state of mind does not embody the deceptive animus that is the avatar of an intent to defraud. Debtor never affirmatively misled any creditor about his intent to apply his assets to satisfy his debt; nor did he deflect any inquiry or collection effort by lying about what he was doing in the course of his "bankruptcy estate planning." *Cf. McCormick,* 822 F.2d at 808 (where debtor actually lied about his current ability to pay a pressing creditor, while concurrently and secretly liquidating non-exempt assets to divert to the purchase of an exempt homestead). During the relevant one-year period, Debtor was subject to full examination via proceedings supplementary in any collection action which had been reduced to judgment. He was also subject to pre-judgment deposition, attachment, or other discovery or preventative remedy in those collection actions still in suit. He was actually examined in at least two such lawsuits. There is no evidence that he either lied or failed to fully respond to any inquiry propounded to him in any of these proceedings. He fully disclosed all · of his pre-petition actions in the Statement of Financial Affairs accompanying his bankruptcy petition, testified to the same at the Meeting of Creditors, and was candid and forthcoming in his testimony at the trial of this adversary proceeding. To be sure, he did not volunteer any unsolicited information as to his current actions to any of his creditors. It was however, not incumbent upon him to do so as a hedge against any claim of fraud in his subsequent bankruptcy case, where creditors were not investigating his acts or financial condition and where he was not negotiating any advance, extension, renewal, or refinancing of credit or otherwise seeking himself to gain an advantage over his creditors in direct dealings. By no stretch of the legal imagination can his conduct be termed direct evidence of an intent to defraud his creditors; neither, in their entirety, do all of these circumstances require or even permit an inference of fraudulent intent.

The question, then, devolves to whether Debtor's express intent to put his wealth "beyond the reach of [his] creditors" constitutes an "intent to hinder ... [or] delay" under the statute. "Hinder" is dictionary-defined as "to delay, impede, or prevent action"; "delay" is dictionary-defined as "to stop, detain, or hinder for a time." WEBSTER'S NEW COLLEGIATE DICTIONARY at 536–7 and 297 (1979 ed.). At least from a layman's perspective, one could say that Debtor's specific intent was one to hinder, or at least to delay, his creditors and/or his bankruptcy trustee from seizing a major portion of his personal wealth to apply to his debts.

The issue, however, is not one of mere semantics. The language of 11 U.S.C. § 727(a)(2) is an integral part of Chapter 7 and the entire Bankruptcy Code. It must be read and applied in a fashion consistent with the organizational integrity of the Code, the intent of Congress as expressed in the legislative history, common sense, and public policy. Judicial interpretations of crucial Code sections such as § 727(a)(2) should, to the greatest extent possible, settle the constructions given to statutory language, delineate (or at least suggest) the parameters of conduct permissible and proscribed under the statute, and define and delimit the options available to parties and litigants in bankruptcy cases, both pre- and post-petition. The recent case law has not completely met these goals.

One cannot divine the meaning of the phrase "intent to hinder ... [or] delay" under § 727(a)(2) without reference to other relevant Code sections and their legislative history. Debtor has defended his "bankruptcy estate planning" process on the ground that he undertook it only to maximize his right to exemptions in a bankruptcy liquidation. Debtor's right to claim exemptions in a Chapter 7 bankruptcy of course springs from 11 U.S.C. § 522(b). The legislative history to that section provides:

> As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.

H.R.REP No. 595, 95th Cong., 1st Sess. 360–1 (1977). S.REP. No. 989, 95th Cong. 2d Sess. 75–6 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5862, 6317. This language is frequently mis-cited as direct evidence that Congress intended not to bar discharge to debtors who had engaged in pre-petition "bankruptcy estate planning." In point of fact, this language appears only in those portions of the 1977–8 House and Senate committee reports dealing with the debtor's exemption rights in bankruptcy. The only legal proposition that this language directly supports is that the transformation of non-exempt assets to exempt assets on the eve of bankruptcy does not taint the debtor's subsequent claim of exemption in those assets, and that the non-exempt character of the source is not legally traceable to the property claimed as exempt so as to vitiate the exemption claim.

*In re Reed,* 700 F.2d 986, 990 (5th Cir. 1983).

The proposition is, however, relevant to the discharge issue in a more subtle fashion. Ultimately, the provisions for objection to discharge in § 727(a)(2) serve a punitive function, by denying discharge to debtors who have committed serious wrongdoing. Several of the provisions address a debtor's failure to properly respond to the process of inquiry and administration in the bankruptcy case itself. *See* 11 U.S.C. §§ 727(a)(4)–(7). Two of them address pre-petition conduct of such a nature that it is deemed to taint the debtor's request for equitable relief in bankruptcy. *See* 11 U.S.C. §§ 727(a)(2)–(3).[8] A grant of discharge is essential to the "fresh start" that is the recognized goal of Bankruptcy relief. Objections to discharge are to be construed narrowly. The bankruptcy Court should limit denial of discharge under the provisions of § 727(a) dealing with pre-petition conduct to those cases where a debtor's actions are truly blameworthy in an equitable sense. Any judicial definition or delimitation of a statutory element under § 727(a), such as "intent to hinder ... [or] delay," must be structured accordingly.

The question then is, what is truly blameworthy about a debtor's intentional resort to "bankruptcy estate planning," standing alone? From a purely legal perspective, and only in the context of an objection to discharge, the answer is "nothing"—at least where the debtor has not perpetrated actual fraud on a creditor, creditors, receiver, trustee, or other party in interest during the process. On the record made and facts found in this adversary proceeding, it

---

8. 11 U.S.C. § 727(a)(3) is designed to promote full financial disclosure in bankruptcy by making a debtor's right to discharge contingent on his ability to produce documents produced and maintained pre-petition that adequately reflect his business transactions and asset and debt structure. *In re Losinski,* 80 B.R. 464, 469–70 (Bankr.D.Minn.1987); *In re Drenckhahn,* 77 B.R. at 707–8. It is, however, open to a debtor to defend such an objection to discharge by either producing the documents at trial or by adequately explaining their absence. *Id.* 11 U.S.C. § 727(a)(5) is designed to work in tan-

dem with § 727(a)(3), to foster the same process of investigation and disclosure, by requiring a debtor to give a satisfactory explanation of his insolvency, after the commencement of the bankruptcy case. *In re Drenckhahn,* 77 B.R. at 709–10; *In re Losinski,* 80 B.R. at 469–70. Adversary proceedings under these provisions have a unique dual function: to force discovery for possible use in other proceedings in the debtor's bankruptcy case, and to deny discharge to the debtor who does not furnish the *quid pro quo* for discharge by cooperating in that investigative process. *In re Losinski,* 80 B.R. at 469.

cannot be concluded that Debtor has transferred property with an intent to hinder or delay his creditors or his trustee in bankruptcy, within the meaning of 11 U.S.C. § 727(a)(2). The most the record shows is that Debtor engaged in a conscious, directed effort to maximize the benefit of statutory exemptions available to him, without engaging in any fraud. In doing so, he was not only following the advice of counsel, he was only effectuating that which he was legally empowered to do without endangering his future claims of exemption. The caselaw in this Circuit has long recognized the principle noted in the legislative history—that the pre-petition conversion of non-exempt assets to an exempt form is not fraudulent *per se*. *See In re Lindberg*, 735 F.2d 1087, 1090 (8th Cir.1984) (recognizing debtor's right under 1978 Bankruptcy Code to make full use of exemptions, even via such conversions); *Crawford v. Sternberg*, 220 F. 73 (8th Cir.1915), and *First Nat'l Bank of Humboldt v. Glass*, 79 F. 706 (8th Cir.1897) (two cases under the Bankruptcy Act of 1898 declining to avoid, as fraudulent conveyances, pre-petition conversions by bankrupt of non-exempt to exempt property); *In re McGlynn*, No. 4–74 BKY 925(*o*) (D.Minn., Owens, B.J., February 8, 1979) [published as appendix to *Mickelson v. Anderson*, 31 B.R. 635 (Bankr.D.Minn. 1982), at 31 B.R. 639–663]. *Cf. Kangas v. Robie*, 264 F. 92 (8th Cir.1920) (Act case, in which bankrupt's homestead exemption claim was denied on basis of "confession of bad faith"—equating to intent to defraud creditors—in cessation several weeks pre-petition of his regular practice of depositing all business receipts in his bank account, and in diversion of those receipts into purchase of a homestead then claimed as exempt.). The decisions of the Minnesota Supreme Court have long been in agreement. *See, e.g., In re Tveten*, 402 N.W.2d 551, 555 (Minn.1987); *O'Brien v. Johnson*, 275 Minn. 305, 308, 148 N.W.2d 357, 360 (1967); *Jacoby v. Parkland Distilling Co.*, 41 Minn. 227, 229–30, 43 N.W. 52, 52 (1889). Intent of a character so malign as to merit

the harshest sanction in bankruptcy should not be attributed to a debtor who does this, and nothing more. The Eighth Circuit has long recognized this principle also. *See Forsberg v. Security State Bank of Canova*, 15 F.2d 499 (8th Cir.1926); *In re Olson*, 45 B.R. 501 (Bankr.D.Minn.1984). *See also In re Ford*, 53 B.R. 444, 448 (W.D.Va. 1984); *In re Cruikshank*, 63 B.R. 727, 729–30 (Bankr.W.D.N.Y.1986).

The gut-level difficulty with the case at bar stems both from the massive amounts of money involved and from Debtor's status as an affluent physician enjoying sound professional status, excellent current income, and unlimited future earning potential. The vast difference between Debtor's present circumstances and the financial plight of most consumer and small-business debtors in bankruptcy cannot be denied or ignored. Whether this fact should control or even affect the outcome of an objection to discharge is the question. This is neither the first nor the last time that a Chapter 7 debtor in this Court has engaged in some form of "bankruptcy estate planning" before filing: the conduct is much more prevalent than either party to this adversary proceeding would probably care to admit. Any court which addresses a situation like the one at bar, and then considers denying discharge, must consider the precedential consequences of its ruling. What test is to be applied, where transfers during "bankruptcy estate planning" can range in magnitude from a few dollars up to amounts much larger than those involved here?

It might be argued that a debtor should be free to pass assets through the process of "bankruptcy estate planning" without jeopardy to his right to discharge, subject to some value limitation which the Bankruptcy Court should fix. The corollary to this argument is that, at some level of value, such transfers automatically become so offensive that denial of discharge is mandated.[9] It might also be argued that

---

9. This test is popularly phrased via the fine, homely folk adage of "The pig gets fattened, but the hog gets slaughtered." *See Dolese v. United*

*States*, 605 F.2d 1146, 1154 (10th Cir.1979) (using the variant: "There is a principle of too much; phrased colloquially, when a pig be-

conversions into forms of property which have some nexus to the needs of basic sustenance [10] should be safe, and that the debtor performing them should not be denied discharge. The other side of such arguments would be that conversion into all other forms [11] is automatically so invidious as to mandate denial of discharge.

The question ultimately boils down to a choice between three options: sanctioning *all* instances of "bankruptcy estate planning" by denial of discharge; formulating some standard for the Court's application, to deny discharge in some cases and not to do so in others; or overruling *all* objections to discharge in cases of "bankruptcy estate planning" unless the Court finds an act of actual fraud or the presence of a malign, directed intend to hinder or delay creditors or the trustee.

No reported case has adopted the first alternative without qualification, and Plaintiff has not even argued that this Court should adopt it. It must be rejected as wholly inconsistent with the long-established case law cited earlier.

The difficulties with the second alternative are many, but there are at least two major ones. First, the argument, though not without some surface appeal to any court charged with the exercise of equitable discretion, ultimately requires a case-by-case determination of whether the aggregate transfer exceeds a previously-determined permissible amount or propor-

tion, or whether the new exempt form has the requisite nexus to basic life needs. This determination would necessarily be left to the discretion of the Bankruptcy Court. The cited examples may be clear-cut, but even a cursory consideration suggests many situations which are not.[12] Debtors and their counsel should not be faced with "choices between the lady and the tiger" in pre-bankruptcy planning, where the legislative branches of the state and federal governments have already made a policy determination that particular classes of property should be protected from claims of creditors and where both Congress and the courts have recognized that a debtor may consciously structure and direct his invocation of those protections with at least some impunity.

This point highlights a second major reason why it is inappropriate to punish "bankruptcy estate planning" by denial of discharge, at least where it is untainted by fraud, misrepresentation, or other evidence of a malign animus targeted toward creditors generally or toward a particular creditor. Congress and the state legislatures have created and structured exemption statutes, motivated at least initially by twin concerns of humanitarianism and utilitarianism. The twin purposes of exemption statutes are to prevent both private destitution and hardship and the drain on the public purse caused by debtors' resort to

---

comes a hog it is slaughtered."). Use of this metaphor to structure a standard under § 727(a)(2)(A) would produce problems, but it would be at least marginally more defensible than the other colloquialism suggested by Plaintiff's counsel. Animal husbandry at least furnishes weight and age tests to divide "pigs" from "hogs"; the use of a "smell" test, while of some utility in the most extreme (presumably to be read "most odious") cases, would be so subject to the pitfalls of subjectivity as to have no paradigmatic value at all. Everyone's nose, after all, is different.

10. Such as, for instance, the closing of a small non-exempt bank account, to apply the funds to fill automobile gas tanks for commuting to work, to stock up on groceries, or even to pay several house payments in advance.

11. Such as, for instance, the transfer of hundreds of thousands of dollars' worth of liquid investments into a statutorily-exempt form hav-

ing most of the liquidity and access characteristics of a regular bank certificate of deposit.

12. For instance, should a debtor who applies a pre-petition $35,000.00 workers' compensation award for permanent partial disability to pay off his homestead mortgage then be denied discharge? To the extent the award was paid pre-petition, it would be cash in the debtor's hands, non-exemptible under Minnesota state statute and exemptible only in minor part under the federal exemptions of 11 U.S.C. § 522(d). Arguably, the functional work limitations imposed by that debtor's disability would lower his income potential and standard of living; should he be subject to the crushing sanction of denial of discharge for cushioning the financial impact of a major work-related injury by eliminating a large monthly obligation from his household budget?

welfare, by allowing debtors to retain property necessary to maintain household, livelihood, and retirement security. *See, e.g., Poznanovic v. Maki,* 209 Minn. 379, 382, 296 N.W. 415 (1941); *Boelter v. Klossner,* 74 Minn. 272, 273, 77 N.W. 4 (1898); *Berg v. Baldwin,* 31 Minn. 541, 542, 18 N.W. 821 (1884); *Grimes v. Bryne,* 2 Minn. (Gil.) 72, 85–6 (1877). The legislative branch alone determines what is necessary to maintain these functions and to meet a debtor's needs, by establishing the nature and value of the property subject to claims of exemption. It makes its determination through the political process; its conclusions must be accorded an initial presumption of constitutionality, a presumption that they were the result of rational and balanced consideration of public policy, and a presumption that they are properly structured to meet statutory goals. Congress has also stated, unequivocally, that a conscious effort to invoke and maximize exemption protections is not fraudulent or abusive, in and of itself. To deny discharge for a debtor's non-fraudulent invocation of these protections is, overtly or covertly, to make a political and/or value judgment on these legislative determinations. To equate a non-fraudulent intent to "place assets beyond the reach of creditors" with an invidious intent "to hinder or delay creditors" is ultimately to frustrate statutory exemption rights, by causing a chilling effect on the full exercise of those rights. A court which causes such a chilling effect is, in a very real sense, invading legislative prerogatives by substituting its own judgment for that of the legislature.[13]

In short, then, this Court declines to equate the intent presented here with an intent to "hinder, delay or defraud creditors" under 11 U.S.C. § 727(a)(2).[14] Debtor did not engage in the kiting of assets between various locations and forms of ownership and character, accompanied by overt misrepresentations and fraudulent concealment, which the Eighth Circuit excoriated in *McCormick.* Debtor rather made a conscious, if selfish, effort to fully avail himself of the full range of debtor protections afforded by the Minnesota state legislature, in a fashion which had been explicitly condoned by decisions of both state and federal courts in Minnesota. The fact that the actions and their results were wholly self-serving is immaterial. One would scarcely expect a wealthy debtor faced with an overwhelming debt burden and involved in pitched conflict with his creditors to act in any other way. Debtor's actions were born of and consummated in an inescapably adversarial situation. They came about only after his commendable resort to advice from able and learned counsel, and were wholly structured by that advice. They were undertaken in full realization of the unquestionable outcome of any other course of acton, or no action at all. The ultimate result, is, of course, that Debtor reaps a "windfall" by retaining several hundred thousand dollars' worth of property, even if his claim of exemption for the Modern Woodmen annuities is disallowed. This result, however, cannot be laid at Debtor's feet; it must be laid at the feet of the Minnesota state legislature. Debtor did nothing more than exercise a prerogative that was fully his under law. It cannot be said that his actions have so tainted him or his bankruptcy petition as to merit denial of discharge.[15]

---

**13.** Of course, this is not to say that the courts should not pass upon the constitutionality of exemption statutes when that issue is presented to them in the context of an objection to a debtor's claim of exemptions; the application of the organic law of state or federal Constitution to legislation via judicial review is a proper and essential function of the Courts. The Minnesota Supreme Court did just this in *In re Tveten,* 402 N.W.2d 551, and its invalidation of the "fraternal benefit exemption" of MINN.STAT. § 550.37 subd. 11 via application of MINN.CONST. art. 1, § 12 has probably undercut much of Debtor's "bankruptcy estate planning" process.

**14.** This conclusion obviates any application of the "badges of fraud" test set forth in *In re Clausen,* 44 B.R. at 44. The test has ample utility in discharge objections involving transfers of property to third persons, clandestine or overt, or concealments of property from creditors or trustee—but not in an objection involving "bankruptcy estate planning."

**15.** The substantive outcome here is diametrically opposed to that reached by this Court (Kressel, C.J.) in *In re Tveten,* 70 B.R. 529. In *Tveten,* Judge Kressel concluded that an aggregate pattern of transfers almost identical to the one at

**ORDER FOR JUDGMENT**

IT IS THEREFORE ORDERED, AD-JUDGED, AND DECREED that entry of a discharge under Chapter 7 of the Bankruptcy Code in Defendant's favor in BKY 3-86-207 is not barred by 11 U.S.C. § 727(a)(2)(A).

LET JUDGMENT BE ENTERED AC-CORDINGLY.

bar would merit denial of discharge under 11 U.S.C. § 727(a)(2)(A). As Judge Kressel was affirmed on appeal by the District Court (Murphy, J.), some question may arise as to whether the present decision comports with the law of this District. Judge Kressel based his decision upon findings of fact that were rather terse. Judge Murphy characterized the ultimate issue in *Tveten* as being one of fact, and affirmed by concluding that Judge Kressel's finding of intent was not clearly erroneous. *In re Tveten,* 82 B.R. at 96-97. The outcome in *Tveten* followed in direct sequence from Judge Kressel's basic and unequivocal findings. The evidentiary record in *Tveten* is not before this Court. There is no way to compare the raw evidence as to Tveten's intent with the evidence of Debtor's intent. This comparison is the necessary first step to determine whether *Tveten* has any precedential or persuasive effect on this proceeding. As cast by both the trial and appellate courts, the decision in *Tveten* must be considered as specific to the record before Judge Kressel. It perforce has little applicability to the case at bar. As structured on their face, the two opinions in *Tveten* cannot be read for the proposition that a consummated intent to engage in "bankruptcy estate planning," without more, equates to the intent proscribed by 11 U.S.C. § 727(a)(2)(A).