In re Omar A. TVETEN, Debtor.

NORWEST BANK NEBRASKA, N.A., Business Development Corporation of Nebraska and Harold J. Panuska as Trustee for the Harold J. Panuska Profit Sharing Trust and the Harold J. Panuska Employee Trust Fund, Plaintiffs,

v.

Omar A. TVETEN, Defendant.

Bankruptcy No. 4–86–30.
Adv. No. 4–86–71.

United States Bankruptcy Court,
D. Minnesota.

Feb. 27, 1987.

See also, Minn., 402 N.W.2d 551.

**530**

Gordon B. Conn, Jr., Faegre and Benson, Minneapolis, Minn., for plaintiffs.

Cass S. Weil, Peterson, Franke & Riache, St. Paul, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

ROBERT J. KRESSEL, Chief Judge.

This proceeding came on for trial to determine whether the debtor's discharge should be denied. Gordon B. Conn, Jr., appeared for the plaintiffs and Cass S. Weil appeared for the defendant. This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 103(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J). Based on the evidence, stipulation of facts, and the file of this proceeding, I make the following:

## FINDINGS OF FACT

The defendant, Omar A. Tveten, is a physician in general practice and the sole shareholder of Omar A. Tveten, P.A., a professional corporation. The plaintiffs are creditors of Tveten through various investment ventures. Norwest Bank Nebraska, N.A., and Business Development Corporation of Nebraska are creditors by reason of Tveten's personal guaranty given in May 1982 for the debt of Madison Creamery, Inc. Panuska and the trust funds are creditors by reason of Tveten's promissory note and personal guaranty.

Tveten's financial troubles began in the middle of 1985 when his business investments resulted in extensive personal liabili-

ty on promissory notes and guaranties. Several creditors filed lawsuits against Tveten and judgments were entered starting in October 1985.[1] After consulting with counsel and as part of his prebankruptcy planning, Tveten liquidated numerous nonexempt assets and invested the proceeds in annuities and life insurance contracts issued by Lutheran Brotherhood, Inc., a fraternal benefit society. He admits to making the transfers intending to place the assets outside the reach of his creditors. In particular:

1. On September 28, 1985, Tveten transferred 320 acres of agricultural land in Mahnomen County, Minnesota, to his parents, Olav L. Tveten and Alpha T. Tveten. He received $70,000 in cash, of which he invested $40,000 in an annuity contract and $30,000 in a life insurance contract, both with Lutheran Brotherhood. Tveten also retained the vendor's interest in an contract for deed for the balance of $64,500.

2. On October 21, 1985, Tveten transferred 480 acres of agricultural land in Larimer and Boulder Counties, Colorado, to his brother, Alan B. Tveten. Tveten received $75,732 in cash which he invested in a life insurance contract with Lutheran Brotherhood.

3. On November 12, 1985, Tveten exchanged Banker's Life insurance contracts numbers 2008536, 2022632, 2046749, and 2174018 for an interest in a life insurance contract with Lutheran Brotherhood. The cash value of the Banker's Life contracts was $13,172.42.

4. Also on November 12, 1985, Tveten received $27,820.91, net after payment of withholding taxes, in accumulated salary and bonuses from his professional corporation, Omar A. Tveten, P.A., which he invested in a life insurance contract with Lutheran Brotherhood.

5. Also on November 12, 1985, Tveten received a partnership distribution from the Quality Furniture Rental Partnership

**1.** Panuska obtained a judgment against Tveten on October 9, 1985, for $139,657. Norwest Bank and Business Development began legal proceedings against Tveten, but had not yet obtained a judgment when he filed bankruptcy.

in the amount of $5,000 which he invested in a life insurance contract with Lutheran Brotherhood.

6. On November 13, 1985, Tveten exchanged Banker's Life Insurance Company annuity contracts A56997 and A55390 for an interest in annuity contracts with Lutheran Brotherhood. The cash value of the Banker's Life contracts was $83,135.16.

7. Also on November 13, 1985, Tveten as trustee of the Omar A. Tveten Self-Employed Retirement Plan, Tveten's KEOGH Plan, reinvested the KEOGH Plan funds represented by Banker's Life Insurance Company contract number A25461 GA5950 into an individual retirement account. The individual retirement account invested the entire amount received of $20,487.35 into Lutheran Brotherhood annuity number B2215697.

8. Also on November 13, 1985, Tveten as trustee of the first amendment and restatement of the Omar A. Tveten, P.A. Profit-Sharing Plan, reinvested the entire balance of the plan, then valued at $325,-774.61 in Lutheran Brotherhood annuity number B2215696. The plan is the owner of the annuity and Tveten is the beneficiary of the plan.

9. On November 19, 1985, Tveten sold a single-family home in St. Paul, Minnesota, to Douglas R. Mitsch, a business partner. He received $50,000 which he invested in an annuity with Lutheran Brotherhood.

10. On November 20, 1985, Tveten sold 151 shares of Citizen Utility Company stock for $6,639.99 which he invested in an annuity with Lutheran Brotherhood.

11. On November 25, 1985, Tveten sold 738.475 shares of National Securities Growth Fund and received $6,860.43 which he invested in an annuity with Lutheran Brotherhood.

12. Also on November 25, 1985, Tveten invested $45.14 in cash in a Lutheran Brotherhood annuity.

13. On November 29, 1985, Tveten sold 50 head of cattle to his brother, Lowell H. Tveten, for $10,000 in cash which he invested in a life insurance contract with Lutheran Brotherhood.

14. On January 7, 1986, Tveten received $658.18 from Steven E. Dewald and Nancy A. Dewald as the regular monthly payment on a contract for deed which he invested in a life insurance contract with Lutheran Brotherhood.

15. Also on January 7, 1986, Tveten received $3,000 in cash from Omar A. Tveten, P.A., which he invested in a life insurance contract with Lutheran Brotherhood.

16. Also on January 7, 1986, Tveten closed a checking account in which he had deposited income from his contracts for deed and rental properties and invested the $1,800 in the account in a life insurance contract with Lutheran Brotherhood.

17. Also on January 7, 1986, Tveten received $1,500 from Inge Steinberg representing the downpayment on a single-family residence located in North St. Paul, Minnesota, which he invested in a life insurance contract with Lutheran Brotherhood. Tveten retained a vendor's interest in a contract for deed for the balance of the purchase price.

Tveten filed a petition under Chapter 11 of the Bankruptcy Code on January 7, 1986. In the appropriate schedule, he claimed the following Lutheran Brotherhood annuities and life insurance contracts as exempt under state law:

| | |
|---|---|
| Annuity No. B2215696 [2] | $325,774.61 |
| Annuity No. B2215690 | $186,680.66 |
| Annuity No. B2215697 | $ 20,487.35 |
| Life Insurance Policy No. 2215687 (cash surrender value) | $166,615.92 [3] |

Tveten now seeks to discharge $18,920,-000.00 in debts including personal guaranties.

---

2. The number of this annuity is erroneously listed as No. 13221569 in Tveten's B–4 schedule.

3. An amended B–4 schedule was supposed to be filed correctly stating the cash surrender value of the life insurance policy as $168,683.51. No amended schedule has been filed.

## CONCLUSIONS OF LAW

The so-called conversion of nonexempt assets into exempt assets can create issues in several contexts in a bankruptcy case including: (1) whether such conversion constitutes a fraudulent conveyance under state law and thus is avoidable under 11 U.S.C. § 544(b), *Bergquist v. Theisen (In re Theisen)*, 45 B.R. 122 (Bktcy.D.Minn. 1984); (2) whether such conversion constitutes a fraudulent transfer avoidable under 11 U.S.C. § 548(a)(1), *Mickelson v. Anderson (In re Anderson)*, 31 B.R. 635 (Bktcy.D.Minn.1982); (3) whether the acquired property can be claimed as exempt under Minnesota Law [4] and 11 U.S.C. § 522(b)(2)(A), *Kangas v. Robie*, 264 F. 92 (8th Cir.1920), *In re Olson*, 45 B.R. 501 (Bktcy.D.Minn.1984); (4) whether the acquired property can be claimed as exempt under federal law pursuant to 11 U.S.C. § 522(b)(1) and (d); and (5) whether the conduct is such that the debtor should be denied a discharge under 11 U.S.C. § 727(a)(2).

This adversary proceeding raises the last question. The plaintiffs filed a complaint on April 25, 1986, objecting to Tveten's discharge pursuant to 11 U.S.C. § 727(a)(2)(A), or alternatively, to determine that their debts are nondischargeable under 11 U.S.C. § 523. By agreement, the objection to discharge was tried first. The plaintiffs assert that Tveten's conversion of nonexempt property to exempt annuities and life insurance contracts is cause for denying his discharge under § 727(a)(2)(A). Section 727(a)(2)(A) provides that a discharge shall be granted unless:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition....

11 U.S.C. § 727(a)(2)(A). The sole issue in this proceeding is whether Tveten acted with the requisite intent. To deny a discharge, the debtor must have acted with actual intent to hinder, delay, or defraud a creditor. *Lovell v. Mixon*, 719 F.2d 1373, 1376–77 (8th Cir.1983); *City National Bank v. Bateman*, 646 F.2d 1220, 1222 (8th Cir.1981). This type of intent is rarely proven by direct evidence. Instead, it is usually inferred from the facts and circumstances of the debtor's conduct. *See First Beverly Bank v. Adeeb*, 787 F.2d 1339, 1343 (9th Cir.1986); *First Texas Savings Association, Inc. v. Reed*, 700 F.2d 986, 991 (5th Cir.1983); *Salomon v. Kaiser*, 722 F.2d 1574, 1582 (2d Cir.1983). I find that Tveten had actual intent to defraud credi-

---

4. Tveten claims that the Lutheran Brotherhood annuities and life insurance contracts are exempt under Minn.Stat. § 550.37 and § 64B.18 (1986). Minnesota statute § 550.37 provides in part:

Subdivision 1. The property mentioned in this section is not liable to attachment, garnishment, or sale on any final process, issued from any court.

. . . . .

Subd. 11. All money, relief, or other benefits payable or to be rendered by any police department association, fire department association, beneficiary association, *or fraternal benefit association* to any person entitled to assistance therefrom, or to any certificate holder thereof or beneficiary under any such certificate.

(emphasis added). Minnesota statute 64B.18 entitled "Benefits Not Attachable", provides:

Except as provided in chapter 256B, the money or other benefits, charity, relief, or aid to be paid, provided, or rendered by any society authorized to do business under this chapter shall, neither before nor after being paid, be liable to attachment, garnishment, or other process and shall not be ceased (sic), taken, appropriated, or applied by any legal or equitable process or operation of laws to pay any debt or liability of a certificate holder or of any beneficiary named in the certificate, or of any person who may have any right thereunder.

Various creditors objected to Tveten's claimed exemptions, and certain questions regarding the exemptions were certified to the Minnesota Supreme Court by my order dated September 16, 1986. Regardless of the Minnesota Supreme Court's decision, the outcome of this proceeding is not affected since Tveten's intent is at issue in this proceeding.

tors, as well as, actual intent to hinder and delay creditors.

### (A) *Intent to Defraud*

Mere conversion of nonexempt property to exempt property just before bankruptcy is not enough to deny discharge. *Forsberg v. Security State Bank,* 15 F.2d 499, 501 (8th Cir.1926); *In re Olson,* 45 B.R. 501, 504–05 (Bktcy.D.Minn.1984). *See also Ford v. Poston,* 773 F.2d 52, 54 (4th Cir. 1985); *First Texas Savings Association, Inc. v. Reed,* 700 F.2d 986, 991 (5th Cir. 1983). Such conduct was considered at the time the Bankruptcy Code was being debated.

> As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. *See Hearings,* pt. 3, at 1355–58. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 361, *reprinted in,* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6317. I am not sure that this comment really states universally accepted law. *See Mickelson v. Anderson (In re Anderson),* 31 B.R. 635, 637 (Bktcy. Minn.1982). However, when the conversion is accompanied by some extrinsic evidence establishing an intent to hinder, delay, or defraud creditors, the discharge is denied. *See, e.g., Ford v. Posten,* 773 F.2d at 55.

Tveten cites *Forsberg v. Security State Bank,* 15 F.2d 499 (8th Cir.1926), as the controlling law. In *Forsberg,* the Eighth Circuit Court of Appeals found that the debtor's conversion of nonexempt cattle and hogs to exempt sheep did not constitute fraud justifying a denial of discharge.

> It is well settled that it is not a fraudulent act by an individual who knows he is insolvent to convert a part of his property which is not exempt into property which is exempt, for the purpose of claiming his exemptions therein, and of

thereby placing it out of the reach of his creditors.

.    .    .    .    .

> This has become an established principle, because the statutes granting exemptions have made no such exceptions, and because the policy of such statutes is to favor the debtors, at the expense of the creditors, *in the limited amounts allowed to them, by preventing the forced loss of the home and of the necessities of subsistence,* and because such statutes are construed liberally in favor of the exemption.

*Id.* at 501, *citing, Crawford v. Sternberg,* 220 F. 73, 76–77 (8th Cir.1915) (citations omitted and emphasis added). Although *Forsberg* may still be good law, it is not determinative of the issue in this case. The lower court in *Forsberg* specifically found that the debtor did not transfer the property with intent to hinder, delay, or defraud the creditors. *Id.* at 500. Moreover, *Forsberg* does not preclude a denial of discharge if the fraudulent intent can be inferred from the intentional conversion. *Id.* at 502.

The facts in this case more closely resemble the facts of *First Texas Savings Association v. Reed,* 700 F.2d 986 (5th Cir. 1983). In *Reed,* the debtor sold his antiques, gold coins, and two gun collections to friends and acquaintances just before filing for bankruptcy. He then used the proceeds to reduce the outstanding mortgages on his personal residence. In denying the debtor's discharge, the Fifth Circuit Court of Appeals reasoned that:

> It would constitute a perversion of the purposes of the Bankruptcy Code to permit a debtor earning $180,000 a year to convert every one of his major nonexempt assets into sheltered property on the eve of bankruptcy with actual intent to defraud his creditors and then emerge washed clean of future obligation by carefully concocted immersion in bankruptcy waters.

700 F.2d at 992.

■ While the Fifth Circuit's prose could be described as purple, its reasoning is

sound. Tveten claims approximately $700,-000 in liquid investments as exempt, and seeks to discharge $18,920,000 in debt. Even if the exemptions are allowed, Tveten's conduct in transferring the assets amounts to nothing more than an attempt to defraud creditors, and an abuse of the Bankruptcy Code. There are six indicia of fraud in a § 727 context:

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;

(6) the general chronology of the events in transactions under inquiry.

*Conti-Commodity Services, Inc. v. Clausen,* 44 B.R. 41, 44 (Bktcy.D.Minn.1984). Tveten transferred several parcels of land to family members and business associates. In addition, he liquidated his stocks, Banker's Life insurance contracts, employee retirement plans, and the retained earnings of his professional corporation. At the time the transfers were made, Tveten knew that at least one judgment for $139,657 was entered against him, several other lawsuits were pending and in general his business investments were deteriorating rapidly, exposing him to extensive liability well beyond his ability to pay. Under these circumstances, I find that Tveten converted the property with intent to defraud his creditors. This is not a case like *Forsberg* where the debtor converted property before filing bankruptcy in order to take advantage of the reasonable exemptions provided by state law. Rather, Tveten converted substantial amounts of property into cash and now claims approximately $700,-000 in assets as exempt.

(B) *Intent to Hinder and Delay*

Most courts have focused on the fraud element of § 727(a)(2)(A) in denying discharge. But in *First Beverly Bank v. Adeeb,* the Ninth Circuit Court of Appeals denied the discharge specifically on the ground that the debtor intended to hinder and delay creditors. The debtor in *Adeeb,* on the advice of counsel,[5] transferred real estate to "trusted" friends for no consideration to avoid attachment by creditors. After consulting with a second attorney, the debtor started reversing the transfers and informed the creditors of the situation. Before the debtor could complete the reversing process, he was forced into bankruptcy.

The bankruptcy court found that the evidence established an intent to hinder and delay creditors, and denied a discharge. On appeal, the Ninth Circuit Court of Appeals affirmed the bankruptcy court, noting that:

[The debtor] admitted that he transferred the property intending to put it out of the reach of his creditors. When a debtor admits that he acted with the intent penalized by section 727(a)(2)(A),

---

5. The debtor in *Adeeb* argued that he could not have acted with actual intent to hinder and delay creditors because he made the transfers relying on advice of counsel. In response, the Ninth Circuit stated:

Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts. *See, e.g., Hultman v. Tevis,* 82 F.2d 940, 941 (9th Cir.1936); *In re Nerone,* 1 B.R. 658, 660 (Bankr.S.D.N.Y.1979). However, the debtor's reliance must be in good faith. *See Hultman,* 82 F.2d at 941; *Nerone,* 1 B.R. at 660. In this case, the bankruptcy court found that both

Cooper and Adeeb "knew that the purpose of the transfers was to hinder or delay creditors of the debtor." Such a finding precludes the defense of good faith reliance on the advice of an attorney even if the client is otherwise innocent of any improper purpose. A debtor who knowingly acts to hinder or delay his creditors acts with the very intent penalized by section 727(a)(2)(A).

787 F.2d at 1343. Like the debtor in *Adeeb,* Tveten knew the purpose of the transfers, and therefore, cannot assert his reliance on counsel to negate the intent requirement of § 727(a)(2)(A).

there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent.

787 F.2d 1339, 1343 (9th Cir.1986). Like the debtor in *Adeeb,* Tveten admits to transferring the property to place it out of the reach of creditors. I find that Tveten acted with the requisite intent to hinder and delay his creditors.

### (C) *Procedural Posture*

 I have concluded that Tveten would be denied a discharge if this were a Chapter 7 case. However, this is a Chapter 11 case. In a Chapter 11 case, confirmation of a plan usually constitutes a discharge. 11 U.S.C. § 1141(d). Under § 1141(d)(3):

> (3) the confirmation of a plan does not discharge a debtor if—
>
> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
>
> (B) the debtor does not engage in business after consummation of the plan;
>
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

Because the discharge in a Chapter 11 case depends on the confirmation of a plan, some courts have held that discharge proceedings against Chapter 11 debtors cannot be decided until after a plan has been proposed. *See, e.g., Savoy Records, Inc. v. Trafalgar Associates,* 53 B.R. 693, 696 (Bktcy.S.D.N.Y.1985); *Farm Fresh Poultry, Inc. v. Hooton Company,* 43 B.R. 389, 390 (Bktcy.N.D.Ala.1984); *H.M.B. Associates v. Wilimington Development Corporation, Inc.,* 31 B.R. 516 (Bktcy.E.D.Pa. 1983).

Inasmuch as these cases hold that a bankruptcy court has no power to decide discharge issues in Chapter 11 cases before a plan is proposed, I disagree. Section 1141(d)(3) sets out three separate and distinct elements for denying a discharge. There is no statutory language or legislative history which prescribes when these determinations are to be made. While it may be more practical in most cases to make the determinations after a plan is proposed, there is nothing to prevent the court from deciding the last issue at an earlier time. If Tveten does not file a liquidating plan, or remains in business after confirmation of the plan, then the requirements of 11 U.S.C. § 1141(d)(3) will not have been met and a discharge will be granted regardless of my decision in this order. Final judgment on the objection to discharge will have to wait until a plan is filed.

### ORDER

IT IS ORDERED: Omar A. Tveten would be denied a discharge under 11 U.S.C. § 727(a) if this case were a case under Chapter 7.