In re John W. ELHOLM, Debtor.

**WILDER HEALTH CARE CENTER, Plaintiff,**

v.

**John W. ELHOLM, Defendant.**

**Bankruptcy No. 3-86-1657.
Adv. No. 3-86-234.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Dec. 31, 1987.

Richard J. Pearson, New Brighton, Minn., for defendant.

Robert G. Share, Briggs and Morgan, Minneapolis, Minn., for plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on for trial before the undersigned United States Bankruptcy Judge on October 7, 1987. Plaintiff appeared by its attorney, Robert G. Share. Defendant (hereinafter "Debtor") appeared by his attorney, Richard J. Pearson. Upon the evidence adduced at hearing, counsel's briefs and arguments, and all the other files and records in this adversary proceeding, the Court concludes that Plaintiff is entitled to judgment in its favor, denying Debtor his discharge in bankruptcy under 11 U.S.C. § 727(a)(2)(A).

## FINDINGS OF FACT

Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code in this Court on June 12, 1986. Plaintiff is a large institutional healthcare provider and is Debtor's sole scheduled unsecured creditor, with a scheduled debt of $14,220.29. Debtor's debt to Plaintiff is based upon his personal guarantee of his now-deceased mother's financial obligations to Plaintiff for nursing home care. In 1982, Plaintiff sued Debtor on the guarantee and obtained a default judgment in Minnesota State District Court against Debtor, in the amount of approximately $26,000.00. For approximately two years before Debtor filed his bankruptcy petition, Plaintiff garnished Debtor's paychecks from the State of Minnesota Department of Corrections, effecting approximately 50 garnishments over this two-year period and collecting between $400.00 and $450.00 per month from Debtor's salary. Debtor is an older middle-aged man with two sons in college, and the continued heavy garnishment of his wages caused him and his family considerable financial distress. Debtor was required to cash in two whole life insurance policies during the two-year period to meet household and family expenses. For some reason, he did not consider any form of bankruptcy relief seriously enough to consult counsel until early 1986.

Debtor consulted his bankruptcy counsel in April, 1986, retained him at some point during that month, and executed a petition under Chapter 7 and accompanying statements and schedules on May 2, 1986.

Prior to May, 1986, Debtor held fractional interests in two parcels of real estate, described as follows:

1. A 1.3–acre lot on Sunfish Lake, Washburn County, Wisconsin, held by Debtor and Betty J. Elholm, his wife, as joint tenants, acquired by them in September, 1976, and historically used by Debtor and his family as an occa-

sional weekend retreat. The lot was partially developed, with an old mobile home and storage building located on it.

2. An undeveloped parcel of land in Itasca County, Minnesota, held by Debtor and one Robert A. Munson as tenants-in-common, originally acquired by them and a third party in 1955, and transferred into the joint ownership of Debtor and Munson in 1969, consisting of undeveloped real estate without direct road access, and historically used by Debtor, Munson, and their families for occasional hunting, fishing, or camping purposes.

After executing his bankruptcy petition and schedules, but before his counsel filed them, Debtor transferred his fractional interests in these two parcels of real estate as follows:

1. By a warranty deed executed on May 8, 1986, Debtor transferred his interest in the Washburn County, Wisconsin lakeshore lot to his wife and his two sons.

2. By a warranty deed executed by them on May 15, 1986, Debtor and his wife conveyed Debtor's undivided one-half interest in the Itasca County real estate to Debtor's two sons.

Both of these deeds were recorded on their dates of execution in the appropriate county offices.

As purported consideration for the transfer of the Washburn County lake property, Debtor's wife gave him a check in the sum of $4,500.00, drawn on an account which she had held in her own name at the Roseville Bank, Roseville, Minnesota. In testimony, Debtor's wife alleged that she had always held this account as a trustee for her two sons, though the checks on this account which Plaintiff introduced into evidence do not note this form of ownership on their face. Historically, Debtor's wife has deposited earnings from her own daycare business and employment into this account; Debtor has never deposited his earnings into this account; Debtor and his wife used this account for major household purchases like furniture, appliances, and major home improvements; and Debtor had no direct access as a signatory to the account. Debtor and his wife arrived at the amount of the consideration for the transfer by dividing the assessed value of the lot (as determined by the Washburn County Treasurer for real estate tax purposes) roughly in half. Since the transfer, Debtor and his family have continued to use this property for recreational purposes as they did before the transfer.

As purported consideration for the transfer of the Itasca County property, Debtor's two sons paid him the sum of $500.00. The form of payment is not apparent from the record. Debtor arrived at this valuation by dividing the assessed value of the parcel (as determined by the Itasca County Auditor for real estate tax purposes) in half, and then deducting an additional amount as an offset. Debtor attributed this offset amount to costs which he alleged would be necessary to prepare the property for sale on the open market, including surveying fees (of a total of $1,000.00) and the costs of constructing a bridge for access (of a total of $1,000.00). Since the transfer, Debtor and his family have continued to use this land for recreational purposes on an occasional basis, much as before.

Debtor deposited the $5,000.00 in proceeds from these two transactions in his and his wife's joint checking account on May 19, 1986. Over the course of the month from early May through mid-June, 1986, he wrote checks from the account totalling $6,110.77. These checks were issued for three major purposes: the expenses of the two real estate transfers (consisting of attorney and recording fees, real estate taxes, and deed stamp tax); Debtor's and his family's current routine household expenses for that month (payments for electricity, water-sewer, garbage, and other utilities; groceries; materials for household repair; homestead real estate taxes for the full year of 1986; and family medical bills); and substantial or full payment on several of Debtor's revolving charge card accounts.

At trial, Debtor testified that he transferred his record title interests in the two

parcels of real estate to family members to get some money "so [he] could pay off the people [he] owed money to," and "because [he] had a great need for some money." He repeatedly denied that he had made the transfers to put the value of the assets in question beyond the reach of creditors, or specifically to make that value unavailable to his trustee in bankruptcy or to Plaintiff.

Debtor's bankruptcy case was initially denominated as a "no-asset case," as Debtor's asserted claims of exemption encompassed the full value of all of his scheduled assets. No creditor or other party in interest objected to Debtor's claims of exemption. The Trustee did garner assets into the estate, from the balance in one bank account open as of the date of filing and, apparently, from Plaintiff's voluntary surrender of a portion of garnished wages which the Trustee asserted were taken in violation of the preference provisions of 11 U.S.C. § 547(b). As the sole creditor filing a proof of claim, Plaintiff will receive the bulk of the sum of $1,322.59 administered by the Trustee. The grant of discharge under 11 U.S.C. § 727(a) has been delayed pending the outcome of this adversary proceeding.

## CONCLUSIONS OF LAW

■ Plaintiff prays for a denial of Debtor's discharge in bankruptcy under the following provision of 11 U.S.C. § 727(a):

(a) The court shall grant the debtor a discharge, unless—

.     .     .     .     .

(2) The debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be

transferred, removed, destroyed, mutilated, or concealed—

.     .     .     .     .

(A) property of the debtor, within one year before the date of the filing of the petition ...

This provision, as all provisions for objection to the full discharge in bankruptcy under § 727(a), must be construed strictly in favor of the debtor, and strictly against the objecting creditor. *See, e.g., In re Schmit,* 71 B.R. 587, 589–90 (Bankr.D. Minn.1987); *In re Drenckhahn,* 77 B.R. 697, 701 (Bankr.D.Minn.1987); *In re Johnson,* 80 B.R. 953, 957 (Bankr.D.Minn. 1987). The petitioning creditor bears the burden of proving all of the elements set forth under the statute. BANKR.R. 4005; *In re Drenckhahn,* 77 B.R. at 705.

The statutory elements under 11 U.S.C. § 727(a)(2)(A) are as follows:

1. A transfer of property has occurred, made by the debtor or made at his direction or request;

2. A transfer involved property of the debtor;

3. The transfer was made within one year of the commencement of the bankruptcy case;

4. The debtor had, contemporaneously with the transfer, intent to hinder, delay or defraud a creditor or the trustee in bankruptcy.

*In re Johnson,* 80 B.R. at 957–58; *In re Drenckhahn,* 77 B.R. at 704; *In re Clausen,* 44 B.R. 41, 43, (Bankr.D. Minn.1984). *See also In re Bateman,* 646 F.2d 1220, 1222 (8th Cir.1981) (applying § 14c(4) of Bankruptcy Act of 1898).

■ Plaintiff has proven up the first three elements; Debtor's transfers of his interests in the Washburn and Itasca County properties did occur within one year of his bankruptcy filing.[1]

---

1. The conveyances to members of his immediate family, even though accompanied by the passage of consideration, constituted "transfers of property" within the meaning of 11 U.S.C. § 727(a)(2)(A). Even if the conveyances themselves were not appropriately classified as "transfers"—under the rationale that Debtor retained the ostensible value of the real estate in

the form of the cash consideration—Debtor's application of the cash proceeds to various purposes in May and June, 1986, constituted a "transfer" within the meaning of § 727(a)(2)(A). *See McCormick v. Security State Bank,* 822 F.2d 806, 808 (8th Cir.1987) (adopting a construction of the phrase ·"transfer of property" in § 727(a)(2)(A) broad enough to encompass a

The real issue in this adversary proceeding is whether Debtor made these transfers with an "intent to hinder, delay or defraud a creditor or the trustee in bankruptcy" within the meaning of the statute. The same issue has been central in much of the recent reported case law under § 727(a)(2)(A) from this Circuit and District, although in adversary proceedings involving markedly different facts. *See McCormick v. Security State Bank; In re Johnson; In re Drenckhahn; In re Schmit; In re Tveten,* 70 B.R. 529 (Bankr. D.Minn.1987), *aff'd,* 82 B.R. 95 (D.Minn. 1987).

Consistent with the standards of application and procedural burdens previously discussed, the Eighth Circuit has held that a plaintiff-creditor under § 727(a)(2) must prove that the debtor acted with *actual* intent to hinder, delay, or defraud creditors or bankruptcy trustee; a showing of constructive intent does not meet the statutory requirement. *Lovell v. Mixon,* 719 F.2d 1373, 1376–7 (8th Cir.1983); *In re Bateman,* 646 F.2d at 1222. Because the operative terms of the statute are phrased in the disjunctive, a creditor need only show that the debtor acted with one of the three states of mind; a showing of intent to defraud is not absolutely necessary. *In re Bateman,* 646 F.2d at 1225 n. 5; *In re Johnson,* 80 B.R. at 959.

■ The Courts have recognized the difficult problems of proof facing any plaintiff-creditor in discharge or dischargeability proceedings, where a necessary element of the creditor's case is a specific subjective intent on the part of the debtor during a financial transaction or other debt-creating event. As a result, they have declined to adopt a standard requiring a creditor to produce direct evidence that the debtor harbored the proscribed subjective state(s) of mind. *In re Tveten,* 70 B.R. at 532, and cases cited therein. *See also, e.g., In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir. 1987) (applying same principle in dischargeability proceedings under 11 U.S.C. § 523(a)(2)). Thus, under 11 U.S.C.

§ 727(a)(2), it is sufficient if the creditor elicits evidence of a combination of facts and circumstances surrounding the transfers in question, which in their entirety support an inference that the debtor acted with the proscribed intent. *In re Devers,* 759 F.2d 751, 753–4 (9th Cir.1985); *In re Reed,* 700 F.2d 986, 991 (5th Cir.1983); *In re Bateman,* 646 F.2d at 1224; *In re Locke,* 50 B.R. 443, 452 (Bankr.E.D.Ark. 1985). The making of this inference is actually a two-part process. The inferring of the debtor's actual state of mind from a body of circumstantial evidence is only the first part of the inquiry into the intent element. Once the Court finds the debtor's actual intent as a matter of fact, it must then determine as a matter of law whether the proven intent equates to the state of mind which the statute is designed to punish. *In re Johnson,* 80 B.R. at 958.

■ The record made at trial contains no direct or circumstantial evidence that Debtor acted with an intent to defraud his creditors in making the transfers at issue. The essence of "fraud" as the term is applied in discharge and dischargeability proceedings is an active, intentional deception or misrepresentation—"deceit, artifice, or trick." *In re Johnson,* 80 B.R. at 959; *In re Pommerer,* 10 B.R. 935, 939 (Bankr. D.Minn.1981). Debtor never concealed the existence of his interests in the two non-homestead properties from anyone, either during the grueling two years during which Plaintiff garnished his wages, or at any time during the preparation or prosecution of his bankruptcy case. After Plaintiff obtained its judgment against him, Debtor was fully subject to examination in proceedings supplementary to execution. Plaintiff and its counsel apparently were satisfied with ongoing collection via wage garnishment, and never conducted an examination. Contact between Debtor and Plaintiff or its agents was virtually non-existent after the entry of judgment. Debtor cannot be accused of deflecting any inquiry or effort to collect against the two

debtor's deposit of proceeds of sale of non-exempt property into bank accounts and subse-

quent withdrawal for application to purchase of a homestead then claimed as exempt).

non-homestead properties by lying either about their existence or about his intention to apply their value toward satisfying his debt to Plaintiff. *Cf. McCormick,* 822 F.2d at 808 (involving deliberate and knowing misrepresentation by debtor about his current ability to pay creditor's claim, when debtor was at the same time diverting available non-exempt assets to purchase an exempt homestead in another city). Debtor fully disclosed both sales and his use of the proceeds "for misc. living expenses" in Item 12.b. of his Statement of Financial Affairs, filed with his Chapter 7 petition. He testified with full candor about the terms and process of the transfers at the trial in this adversary proceeding. In their entirety, the circumstances do not merit the drawing of an inference that Debtor harbored the deceptive animus that is the avatar of an intent to defraud. *See In re Johnson,* 80 B.R. at 959. Plaintiff has, therefore, failed to prove the fraud alternative for the intent element of § 727(a)(2)(A).

■ The inquiry then shifts to whether Plaintiff has proven that Debtor ws motivated by another sort of intent proscribed by the statute. Under a layman's definition, "to hinder ... [or] delay" is to stop, impede, or prevent action, temporarily or permanently. *In re Johnson,* 80 B.R. at 959. The question of whether a given actual intent equates to an intent "to hinder ... [or] delay" within the meaning of the statute, however, is not a mere semantic exercise; it must be determined in light of the statutory purpose of § 727(a), as well as the broader organizational integrity of the Bankruptcy Code. *Id.* In this regard, the statutory purpose of 11 U.S.C. § 727(a)(2)—"to deny discharge to a debtor intending to defraud creditors who transfers property that would otherwise be property of the estate" [2]—is material.

The only direct evidence of record on Debtor's intent is his trial testimony that he did not act with any intent to put the value of the two non-homestead properties beyond the reach of his creditors, or to make that value unavailable to Plaintiff. This self-serving protestation rings hollow, however, when viewed against all of the surrounding circumstances. Under Plaintiff's incessant collection pressure, Debtor had been financially distressed for two full years. The garnishments were depriving Debtor of a significant portion of his income, leaving him and his family without enough funds to support the fairly modest middle-class lifestyle they had enjoyed. After the financial strain had simply gotten too great, and after he had consulted bankruptcy counsel *and* taken all steps to seek bankruptcy relief but for the formality of filing a petition, Debtor liquidated his interests in the only two sizeable non-exempt assets he owned. Standing alone, to be sure, Debtor's decision to convey the properties does not bespeak an intent either to put the value of those assets beyond the reach of his creditors, or to hinder or delay his creditors or bankruptcy trustee. Neither, really, would a consummation of that decision via an arms-length sale of these property interests to an independent third-party purchaser. The difficulty is, however, that the sale was anything but a neutral, market-generated transaction. Debtor divested himself of all legal claim to ownership based upon record title, by shucking off that title and interest to the members of his immediate family. None of his family members filed for bankruptcy, so the assets as transferred did not automatically pass into an estate under this Court's jurisdiction. The consideration for the Washburn County property came from his wife; and, possibly if improbably, from his sons for the Itasca County property. All of the consideration came out of funds which Debtor and/or his wife had generated during the course of their marriage, and had earmarked for mutually-beneficial family purposes. Under Minnesota family law, the funds in Debtor's wife's bank account were property of their marital community, in which both of them held an inchoate

**2.** *In re Clausen,* 44 B.R. at 44. *See also In re Adeeb,* 787 F.2d 1339, 1344–5 (9th Cir.1986); *In re Hadley,* 70 B.R. 51, 53 (Bankr.D.Kan.1987); *In re Kessler,* 51 B.R. 895, 898 (Bankr.D.Kan. 1985).

interest notwithstanding the status of record title, or any self-serving assertion that they were the sole property of Debtor's wife. *See* MINN.STAT. § 518.54 subd. 5. Regardless of Debtor's attempt to pass off the two transfers as neutral, arm-slength transactions by draping them with trappings of a crude value and equity determination and the purported passage of cash consideration, the surrounding circumstances defeat any such characterization. The Washburn County property continues to be property of Debtor's and his wife's marriage, notwithstanding the divestment of record title to her. *Id.* Debtor has continued to enjoy the full benefit of the property notwithstanding the legal niceties of the transfer. Debtor's wife was not a named purchaser of the Itasca County property and, therefore, Debtor cannot be said to have a continuing inchoate marital interest in that property. However, Debtor has continued to retain the full beneficial use of the property since the transfer, presumably with his sons' assent.

The uses to which the purported cash consideration was directed also belie Debtor's assertions of innocent intent. Debtor diverted the purported value of the properties to fund the process of transfer, and— much more seriously—to eliminate every other conceivable debt or claim which he otherwise would have had to schedule in his bankruptcy petition. He paid numerous current bills for household necessities, for which his wife—and any assets which she asserted to be her sole property—were jointly and severally liable as a matter of law. *See* MINN.STAT. § 519.05. The funds which his wife asserted as her sole property were fully available for the payment of these items, and such payment would not have reduced the family or any of its members to destitution. The result of the whole process was that Debtor was left without any assets which he had to schedule as non-exempt; that, at least from

the face of bankruptcy petition, Plaintiff (as his sole remaining unsecured creditor) would receive no further satisfaction on its claim after his bankruptcy discharge; and that Debtor would continue to enjoy the full benefit and use of the non-exempt property through his family's retention of his prior interest in it.[3] One would have to be blind to ignore the import and consequence of all of these acts and circumstances, occurring as they did after Debtor had consulted with bankruptcy counsel and *after he had executed a Chapter 7 petition.* As against the inference which these factors virtually compel, one simply cannot credit Debtor's conclusory trial testimony; it has no credibility and must be rejected. The nature and sequence of the surrounding circumstances compel a factual finding that Debtor *did* intend to put the value of his non-exempt property beyond the reach of his creditor(s) and the bankruptcy estate, while knowingly retaining the full benefit of that property. The fact that he intentionally paid (and preferred) all of his other creditors does not negate his finding. *In re Adeeb,* 787 F.2d at 1343.

■ The next question under the two-step intent inquiry which this Court adopted in *Johnson* is legal: Does Debtor's intent as determined equate to an intent "to hinder ... [or] delay" within the meaning of the statute? The answer on the record made in this adversary proceeding is "yes." Debtor did not make even the sketchiest of efforts to structure his actions so as to justify them as a maximization of his right to claim exemptions in bankruptcy. He could have done so by using the liquidated value of his non-exempt property to purchase or enhance equity in exempt property. Had he done so, he very arguably would have negated an equation of his implied intent to put assets beyond the reach of his creditors with an intent to hinder or delay under the statute. *In re Johnson,* 80 B.R. at 961. To the

---

**3.** It is probably not coincidental that, with the fully payment of remaining balances on Debtor's various revolving consumer charge card accounts, he was not obligated to schedule those creditors; they therefore would not have immediately or directly—or, in all likelihood, ever— received notice of Debtor's bankruptcy filing; and, as a result, his creditworthiness with them, and his continuing charge privileges, were almost certainly to pass unaffected through the bankruptcy.

contrary, he fully deprived the bankruptcy estate of the value of those assets, preferentially favoring all but one of his potential bankruptcy creditors, and depriving that last creditor of recourse to his non-exempt property without experiencing any loss of the use or enjoyment of the property himself. This is an archetypal example of a "targeted bankruptcy." On the basis of all of these factors, only one conclusion is possible: that Debtor did act with an "intent to hinder ... [or] delay" Plaintiff and the bankruptcy trustee within the meaning of 11 U.S.C. § 727(a)(2)(A) and, accordingly, that Plaintiff has proven up the fourth and final element to support a denial of discharge under that statute.[4]

### ORDER FOR JUDGMENT

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that entry of a discharge under Chapter 7 of the Bankruptcy Code in Defendant's favor in BKY 3–86–1657 is barred by 11 U.S.C. § 727(a)(2)(A).

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**4.** The Court fully recognizes that this debtor is being penalized with denial of discharge—the harshest sanction in bankruptcy—for depriving his bankruptcy estate of the sum of $5,000.00. The debtor in *Johnson*, who was not so penalized, deprived his bankruptcy estate of several hundred thousand dollars by going through an involved process of "bankruptcy estate planning" via liquidation of non-exempt assets and application of the proceeds to exempt assets. It cannot be denied that the vast difference in the sums of money involved, and the opposite substantive results, present some gut-level difficulty. However, for the purposes of an objection to discharge under 11 U.S.C. § 727(a)(2)(A), the magnitude of the prejudice to the bankruptcy estate is irrelevant. The size of the transfer does not bear on the merits of the objection to discharge; a small transfer is as subject to sanction as a large transfer, if all of the elements under the statute are proven. *In re Smith*, 232 F. 248, 254 (N.D.N.Y.1916) (Act case). In this Court's opinion—and as amply evident from a joint reading of this opinion and *Johnson*—the issue is whether the intent to put assets beyond the reach of creditors is effectuated by a process which merely invokes and maximizes statutory debtor's protections or by a process which involves a pretextual transfer which frustrates the process of bankruptcy liquidation, fails in any way to impair the debtor's benefit from the asset, and which is not defensible under the humane precepts governing the exemption provisions of debtor-creditor law.