In re Patricia G. CAREY, Debtor.

**MARINE MIDLAND BUSINESS LOANS, INC., Plaintiff,**

v.

**Patricia G. CAREY, Defendant.**

**Bankruptcy No. 88–2576–TS.
Adv. No. 88–272.**

United States Bankruptcy Court,
W.D. Oklahoma.

Feb. 7, 1989.

David Pomeroy, Terry F. Stokes, Fuller, Tubb & Pomeroy, Oklahoma City, Okl., for Debtor.

Denise Cotter Villani, Karen Eby, Crowe & Dunlevy, Oklahoma City, Okl., for Marine Midland Business Loans, Inc.

## ORDER SUSTAINING IN PART OBJECTION TO CLAIM OF EXEMPTION AND GRANTING JUDGMENT FOR DEFENDANT

JOHN TeSELLE, Bankruptcy Judge.

On April 20, 1988, Debtor sought the protection of the bankruptcy court by filing a petition under Chapter 7 of the Bankruptcy Code. Marine Midland Business Loans, Inc. (hereinafter referred to as "Marine Midland"), filed its Objection to Claim of Exemption (hereinafter the "Objection") on June 20, 1988, to which Debtor responded. Subsequently, on July 18, 1988, Marine Midland filed its Complaint Objecting to Debtor's Discharge seeking to deny Debtor's discharge under 11 U.S.C.A. § 727(a)(2)(A) (West 1979 & . Supp.1988). Debtor's Answer was filed August 16, 1988.

By agreement of the parties the trial in the adversary proceeding and the hearing on the related Objection were conducted together on September 15, 1988. This Order addresses both matters.

### Background

Debtor's husband is William V. Carey, Jr., who was the sole shareholder and president of the now bankrupt Carey Lumber Company (hereinafter referred to as the "Company"). Debtor is a college graduate, successful stockbroker and mother of three young children. Prior to and since filing for bankruptcy, she has been employed by major brokerage firms.

In late 1985, the Company encountered financial difficulties. Thereafter, as the Company's financial problems intensified, Debtor and her husband mortgaged their home to provide an infusion of capital into the business. In addition, Debtor liquidated her portfolio of stocks and loaned the proceeds of approximately $85,000.00 to the Company.

During that time Marine Midland was a major financier of the Company. Debtor and her husband personally guaranteed the obligations the Company owed Marine Midland. Marine Midland's attempt to collect

on Debtor's guarantee precipitated Debtor's bankruptcy.

### Nature of the Matter Before the Court

Rendering a decision in this case is undoubtedly the closest call this Court has yet had to make. Debtor employed legal counsel knowledgeable in bankruptcy law who undertook to extensively engage in an elaborate scheme of pre-bankruptcy planning. Every advantage the bankruptcy law could afford this debtor was utilized to the fullest extent possible.

During the course of Debtor's pre-bankruptcy activities, several transactions occurred which resulted in no monetary gain for Debtor and no apparent loss to the bankruptcy estate. First, her interest in a lake-side home, which appears to have been of no monetary value, was surrendered to its other owners (Debtor's brothers and sisters) in return for their assumption of her share of the mortgage debt. Additionally, Debtor's interest in an Oklahoma City four-plex, which amounted to less than the indebtedness, was surrendered to her father in full satisfaction of the mortgage debt owed him.

On the other hand, Debtor appears to have converted virtually all her remaining non-exempt property, carefully documented as to value, into cash used to pay down the mortgage on her homestead. This included jewelry, Debtor's one-half interest in Carey Equipment Company's assets amounting to approximately $16,000.00, and her interest in a Colorado time-share condominium development amounting to approximately $34,300.00. Also utilized for this purpose were joint income tax refunds, the proceeds from the sale of two cars owned by her husband and a portion of her pre-bankrupt-

cy earnings.[1] In addition, she sold her 100% interest in Carey Properties to Carey, Inc., for $500.00, with her husband thereafter drawing a salary in excess of $1,000.00 per month from Carey, Inc.

The $85,000.00 loan Debtor made to the Company was repaid to her prior to the Company's bankruptcy, and at least $27,200.00 of this repayment was also applied toward the mortgage debt. Whether the loan repayments by the Company to Debtor constitute a preference in the Company bankruptcy is not before this Court.[2]

The only item of non-exempt property not converted to cash or conveyed away by Debtor was that portion of the homestead exceeding the statutorily allowed exemption of one-quarter of an acre of land. This may be another indication of the shrewdness of the lawyer who pre-planned Debtor's bankruptcy, for if this property had been conveyed to a "straw man," that additional fact would probably have tipped the scales against Debtor.

The one transaction not understood by the Court is her husband's conveyance of his one-half interest in the homestead to her[3] as it does not appear this could be reached by his creditors in any event.[4]

### Findings of Fact

The relevant facts in this case are summarized with great clarity in Defendant's Exhibit 1 and Plaintiff's Exhibit 27. These exhibits, attached hereto, are made a part of this Order and constitute the Court's Findings of Fact. A comparison and meshing of the information reflected in these exhibits reveals virtually no dispute as to the facts in this case. The conclusions which the parties urge the Court to draw

---

1. Debtor's earnings have amounted to approximately $60,000.00 per year both before and after filing her bankruptcy petition.

2. This case is so closely interrelated to the Carey Lumber Company bankruptcy (*In re Carey Lumber Co.,* Case No. 86–6294–A) heard by Judge Bohanon of this District that under local rules, this matter should have been transferred to him. However, not until commencing preparation for this hearing did this Court become aware of the Carey Lumber Company bankruptcy, and only during the hearing was the close interrelationship between this case and the Company's bankruptcy proceeding realized.

3. The record is silent as to whether Debtor's husband is paying rent to Debtor for his continued occupancy of the home.

4. His interest in the homestead constituted exempt property under Oklahoma law, and thus could not have been reached by his creditors, other than by the mortgage holder who was unaffected by the transfer.

from these facts are, however, diametrically opposite.

### Issues

Two issues arise for resolution by this Court. First, whether the overt and extensive pre-bankruptcy planning that occurred in this case establishes, as a matter of law, the requisite "intent to hinder, delay or defraud a creditor" within the meaning of 11 U.S.C.A. § 727(a)(2) so as to warrant the denial of Debtor's discharge. Second, whether some or all of Debtor's pre-bankruptcy transactions justify the imposition of a constructive trust or lien on Debtor's homestead for the benefit of the creditors.

### Contention of the Parties

Counsel representing Debtor at the hearing stated that Debtor and her previous counsel did no more than is permitted by the Bankruptcy Code and did so openly, without concealment of assets or commission of fraud. The position of Marine Midland is that the excessive degree of Debtor's pre-bankruptcy planning was such as to constitute a fraud on creditors. As pointed out below, there is case law supporting each of these positions.

### Applicable Law

There is a dearth of case law concerning pre-bankruptcy planning in the Tenth Circuit. Other courts which have addressed this issue are not in accord as to the degree to which such planning may be carried out before it constitutes a fraud on creditors.

The Bankruptcy Code permits "conversion of non-exempt to exempt property for the purpose of placing the property out of the reach of creditors...." *Norwest Bank Neb., N.A. v. Tveten,* 848 F.2d 871, 873 (8th Cir.1988). To deny a debtor's discharge for such conversion there must be extrinsic evidence that the debtor intended to defraud his creditors. *Id.* at 873–74. The difficulty arises in determining when an actual intent on the part of the debtor to hinder, delay, or defraud creditors has been established. *Bank of Pa. v. Adlman (In re Adlman),* 541 F.2d 999, 1003 (2d Cir. 1976); *Wilder Health Care Ctr. v. Elholm (In re Elholm),* 80 B.R. 964, 968 (Bankr.D. Minn.1987). A showing of constructive intent is insufficient, *id.,* but circumstantial

evidence or course of conduct may be used to establish a debtor's actual fraudulent intent. *Founders Bank & Trust Co. v. Swift (In re Swift),* 72 B.R. 563, 565 (Bankr.W.D.Okla.1987) (citation omitted).

Pre-bankruptcy planning has been upheld where the court concluded, based on the evidence before it, that the debtor's transfers were not made with intent to hinder, delay or defraud creditors. *See e.g. Swift,* 72 B.R. at 565 (Bankr.W.D.Okla.1987); *Panuska v. Johnson (In re Johnson),* 80 B.R. 953, 963 (Bankr.D.Minn.1987). Conversely, discharge has been denied when the court found the debtor's conversion of non-exempt assets to exempt assets constituted extrinsic evidence of fraud. *See e.g. First Tex. Savs. Ass'n, Inc. v. Reed (In re Reed),* 700 F.2d 986, 992 (5th Cir.1983); *Norwest Bank Neb. v. Tveten,* 848 F.2d 871, 876–77 (8th Cir.1988).

Courts have also used alternative means to deal with a comprehensive conversion of non-exempt assets to exempt assets. The Hawaii bankruptcy court recently dismissed a case based upon its holding the extensive pre-bankruptcy planning involved therein was undertaken in bad faith and constituted an abuse of the bankruptcy process under 11 U.S.C.A. § 707(a) (West Supp.1988). *In re Brown,* 88 B.R. 280, 285 (Bankr.D.Haw.1988).

Still another court's remedy was the imposition of a lien on the debtor's exempt homestead. *Mickelson v. Anderson (In re Anderson),* 31 B.R. 635, 638–39 (Bankr.D. Minn.1982). The lien imposed was equal to the amount by which the debtor's homestead debt was reduced through the sale of non-exempt assets. *Id.* at 638–39. The merit of this result is that it offers a middle ground between a complete exoneration of the debtor and the harsh results of denying the debtor a discharge or dismissing the case.

### Discussion

■ If the Court finds for Debtor, she will have succeeded in placing close to $180,000.00 beyond the reach of her creditors during the 21–month period immediately preceding the filing of her bankrupt-

cy petition and will emerge from bankruptcy with approximately $300,000.00 of equity in her home, wearing a $2,000.00 mink coat, her household furnishings intact, and with earnings of approximately $60,000.00 a year. Yet as to her creditors, this will be a "no asset" case. It is difficult for this Court to conceive that a debtor could engage in such extensive pre-bankruptcy planning which left nothing for creditors, without at least secondarily intending to "hinder, delay or defraud creditors."

What augurs well for Debtor in this case is that all transactions were fully disclosed in the bankruptcy schedules and at her § 341 hearing. No direct evidence of concealment or fraud concerning Debtor's pre-bankruptcy activities was brought to the attention of the Court.[5]

In an apparent attempt to show such fraudulent intent on the part of Debtor, her husband was questioned during the hearing concerning the inflation of the Company assets in reports submitted to Marine Midland at a time when Debtor was allegedly an officer of the Company. Mr. Carey refused to answer these questions, invoking the protection of the 5th Amendment. Thus, no evidence directly implicating Debtor in such wrongdoing was adduced.

This Court has considered the appropriateness of issuing an order invoking the provisions of subsection (a) of § 707 to justify dismissal of this case. *In re Brown*, 88 B.R. 280, 285 (Bankr.D.Haw. 1988). While § 707(a) provides a non-exhaustive list of factors justifying dismissal, the legislative history of subsection (a) states that a debtor's ability to repay his or her debts is not a factor to be considered.[6] On the other hand, subsection (b) permits a court to dismiss a Chapter 7 case when the debtor is an individual with consumer debt and the court finds that the granting of relief would be a substantial abuse of the provisions of Chapter 7. While Congress has steadfastly resisted enacting compulsory Chapter 13 legislation, subsection (b) has occasionally been applied in cases when the debtor has been clearly able to fund a Chapter 13 plan, but chose not to do so.[7] *See e.g. Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 914–15 (9th Cir.1988). Unless the later enactment of subsection (b) constitutes a change in legislative intent,[8] these two subsections of § 707 point out an inequity in the Bankruptcy Code.

The Court notes this inequity because it is difficult to believe that Congress intended a debtor's repayment ability to be inapplicable to a fact pattern such as the one found in this case. However, if Congress has not seen fit to require debtors who are capable of repaying their non-consumer debts to do so, the Court can only conclude that, absent compelling facts to the contrary,[9] extensive pre-bankruptcy planning is permitted.

No doubt cases such as this lend credence and contribute greatly to the public's perception that the bankruptcy laws unjustly permit "monied" debtors with good lawyers to avoid the payment of their lawful debts. Thus viewed, this case comes perilously close to failing the "smell test." *Morgan Fiduciary, Ltd. v. Citizens S. Int'l Bank*, 95 B.R. 232 (D.Fla.1988).

5. However, the Court notes that in the *Tveten* case, which is somewhat similar on its facts to this case, the court denied the debtor a discharge without requiring a direct showing of concealment or fraud.

6. The legislative history of subsection (a) of § 707 provides that "[t]he section does not contemplate, however, that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal." W.L. Norton, Norton Bankr.Code Pamphlet at 508 (1988–89 ed.) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 380 (1977); S.Rep. No. 989, 95th Cong., 1st Sess. 94 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787).

7. Because Debtor's debts are not "primarily consumer" in nature, subsection (b) of § 707 is not applicable in this case.

8. The disparity between the subsections may be due to the fact that subsection (a) of § 707 was in the original Bankruptcy Code, enacted in 1978, while subsection (b) was added as a part of the 1984 amendments, enacted as a result of the consumer lenders' lobbying efforts.

9. Such compelling facts were shown in *Tveten*, 848 F.2d at 871.

Conclusions of Law

1. The facts in this case are essentially undisputed and the credibility of the witnesses is not in issue. This case can be decided solely as a matter of law.

2. Objections to discharge are to be strictly construed in favor of the debtor. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir.1986); *Swift*, 72 B.R. at 565; *Elholm*, 80 B.R. at 967.

3. Defendant's reliance upon the advice of counsel does not insulate her from any inferences which might be drawn from her actions. *Adeeb*, 787 F.2d at 1343.

4. There has not been a sufficient showing of overt conduct on the part of Debtor from which to infer as a matter of law the requisite intent necessary to deny Debtor a discharge under § 727(a)(2)(A).

5. The evidence is insufficient as a matter of law to support the imposition of a trust or lien upon Debtor's homestead, though this is indeed a close question.

6. Debtor's homestead exceeds in size the amount a debtor is allowed to exempt under Oklahoma law. The excess is property of the bankruptcy estate. Debtor is to designate which portion of her homestead, not to exceed one-quarter acre, is claimed as exempt pursuant to state law. Such designation is to be filed as a part of this case within thirty days from the issuance of this Order.

Accordingly, Marine Midland's Objection is sustained in part, and denied in part. Judgment will be entered in favor of Debtor.

IT IS SO ORDERED.

## APPENDIX

### Defendant's Exhibit 1

| | AMOUNTS PAID ON MORTGAGE NOTE | | Payment | Balance |
|---|---|---|---|---|
| May 16, 1985 | Original Note-due May 16, 1986 | | | 300,000 |
| July 1, 1986 | Payment–1985 Tax Refund | | (20,000) | |
| Sept. 30, 1986 | New Note with Memorial Bank Principal payments of $23,333 due each quarter. | | | 280,000 |
| Oct. 30, 1986 | Payment– | | | |
| | 1982, 1983, 1984 Tax Refunds | 23,652 | | |
| | Lawsuit award | 5,000 | | |
| | Earned Income | 18,014 | (46,666) | 233,334 |
| April 1, 1987 | Payment– | | | |
| | McPherson Note paid | 9,500 | | |
| | Earned Income | 13,833 | (23,333) | 210,001 |
| April 30, 1987 | New Note with Memorial Bank reducing interest rate and principal payments to $42,000 per year. | | | |
| May 26, 1987 | Payment– | | | |
| | 1986 Tax Refund | 21,730 | | |
| | Sale of auto | 16,500 | | |
| | Distribution from CEC partnership | 16,226.48 | | |
| | Earned income | 5,543.52 | (60,000) | 150,001 |
| Aug. 17, 1987 | Payment–Earned income | | (20,000) | 130,001 |
| Sept. 17, 1987 | Payment–Earned income | | (20,000) | 110,001 |
| Nov. 17, 1987 | Payment–Earned income | | (15,000) | 95,001 |
| March 3, 1988 | Payment– | | | |
| | Auto Sale | 2,950 | | |
| | Earned income | 7,050 | (10,000) | 85,001 |
| April 7, 1988 | Payment–1986 Tax Refund | | ( 5,000) | 80,001 |
| April 12, 1988 | Payment–Earned income | | (9,072.56) | 70,928.44 |

**342** 

| | | | Payment | Balance |
|---|---|---|---|---|
| | AMOUNTS PAID ON MORTGAGE NOTE | | | |
| April 15, 1988 | Payment– | | | |
| | Sale of Stock | 34,300 | | |
| | Sale of Jewelry | 3,350 | (37,650) | 33,278.44 |
| April 17, 1988 | Payment– | | | |
| | Earned Income | | (3,027.90) | 30,250.54 |

Plaintiff's Exhibit 27

EXEMPTION PLANNING TIME LINE
1986-1987

EXEMPTION PLANNING TIME LINE
1987-1988